# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF MICHIGAN

|  |  |  |
|---|---|---|
| JEANNA NORRIS, on behalf of herself<br>and all others similarly situated, | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 1:21-cv-00756 |
| | ) | |
| vs. | ) | |
| | ) | |
| PRESIDENT SAMUEL L. STANLEY, JR., | ) | |
| in his official capacity as President of | ) | |
| Michigan State University; DIANNE | ) | |
| BYRUM, In her official capacity as Chair | ) | |
| of the Board of Trustees, DAN KELLY, | ) | |
| in his official capacity as Vice Chair | ) | |
| of the Board of Trustees; and RENEE | ) | |
| JEFFERSON, PAT O'KEEFE, | ) | |
| BRIANNA T. SCOTT, KELLY TEBAY, | ) | |
| and REMA VASSAR in their official | ) | |
| capacities as Members of the Board of | ) | |
| Trustees, | ) | |
| | ) | |
| Defendants. | ) | |

# DEFENDANTS' RESPONSE IN OPPOSITION
# TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................................................. 1

II.  RELEVANT FACTS ........................................................................................... 2

    A.   COVID-19 Pandemic................................................................................. 2

        1.   COVID-19................................................................................... 2

        2.   History and Status of the Pandemic ........................................... 2

        3.   COVID-19 Vaccinations............................................................. 3

        4.   COVID-19 Risks to and Caused by Unvaccinated Individuals............ 6

        5.   Guidance for Institutions of Higher Education .......................... 7

    B.   MSU........................................................................................................ 8

    C.   MSU's COVID-19 Policy......................................................................... 9

    D.   Plaintiff Jeanna Norris ............................................................................ 9

III. LEGAL STANDARD........................................................................................ 10

IV.  ARGUMENT ..................................................................................................... 11

    A.   Norris is unlikely to succeed on the merits.............................................. 11

        1.   Rational Basis Scrutiny applies to Norris's substantive due process claim....... 11

            a.   MSU's policy is reasonably related to MSU's compelling interest in protecting its students, faculty, and staff from COVID-19...................... 15

        2.   MSU's policy does not impose an unconstitutional condition. ......................... 21

        3.   MSU's policy is not preempted by the EUA Statute. ....................................... 24

            a.   The EUA Statute does not prohibit employer vaccination requirements.  24

            b.   Norris has not been deprived of informed consent or her ability to refuse the vaccination. ......................................................................... 25

            c.   FDA's approval of the Pfizer vaccine undermines Norris's claim. .......... 26

    B.   Norris has made no showing of irreparable harm ...................................... 27

    C.   The harm to MSU if its policy is enjoined outweighs any harm Norris might suffer. 28

    D.   The public interest supports MSU's Policy. .............................................. 28

V.   CONCLUSION.................................................................................................. 29

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Albright v. Oliver,*
510 U.S. 266 (1994) ................................................................. 11

*Altman v. Cty. of Santa Clara,*
464 F. Supp. 3d 1106 (N.D. Cal. 2020) ................................. 29

*Am. Fed'n of Grain Millers (AFL-CIO), Local 3 v. Kellogg Co.,*
No. K89-64 CA, 1989 WL 230574 (W.D. Mich. Nov. 3, 1989) ................................. 27

*Ammend v. BioPort, Inc.,*
322 F. Supp. 2d 848 (W.D. Mich. 2004) ................................. 25

*Bridges v. Houston Methodist Hosp.,*
No. H-21-1774, 2021 WL 2399994 (S.D. Tex. June 12, 2021) ................................. 24, 25

*Buck v. Bell,*
274 U.S. 200 (1927) ................................................................. 12

*CH Royal Oak, LLC v. Whitmer,*
472 F. Supp. 3d 410 (W.D. Mich. 2020) ................................. 11

*City of Pontiac Retired Emps. Ass'n v. Schimmel,*
751 F.3d 427 (6th Cir. 2014) (en banc) (per curiam) ................................. 11

*Commonwealth of Ky. v. Beshear,*
981 F.3d 505 (6th Cir. 2020) ................................................. 10, 11

*Cruzan v. Dir., Mo. Dep't of Public Health,*
497 U.S. 261 (1990) ................................................................. 13

*D.T. v. Sumner Cty. Sch.,*
942 F.3d 324 (6th Cir. 2019) ................................................. 27

*Darks v. City of Cincinnati,*
745 F.2d 1040 (6th Cir. 1984) ............................................... 23

*Friendship Materials, Inc. v. Mich. Brick, Inc.,*
679 F.2d 100,105 (6th Cir. 1982) ........................................... 27

*Guertin v. State,*
912 F. 3d 907 (6th Cir. 2019) ................................................ 13

*Harris v. Univ. of Mass.*,
　No. 21-cv-11244, 2021 WL 3848012 (D. Mass. Aug, 27, 2021) ...............................15, 21

*Hartman v. Acton*,
　No. 2:20-CV-1952, 2020 WL 1932896 (S.D. Ohio Apr. 21, 2020) ................................. 23

*Hunter v. Hamilton Cty. Bd. of Elections*,
　635 F.3d 219 (6th Cir. 2011) ..................................................................................... 28

*Ivy Room LLC v. City of Hazel Park*,
　No. 21-10910, 2021 WL 2177079 (E.D. Mich. May 28, 2021)...................................... 11

*Jacobson v. Massachusetts*,
　197 U.S. 11 (1905) .............................................................................................11, 12, 13

*King v. Harwood*,
　No. 3:15-CV-762-GNS, 2021 WL 6029633 (W.D. Ky. Dec. 5, 2017)........................... 27

*Klaassen v. Trs. of Ind. Univ.*,
　No. 1:21-cv-238, 2021 WL 3073926 (N.D. Ind. July 18, 2021)............................... passim

*Klaassen v. Trs. of Ind. Univ.*,
　7 F.4th 592 (7th Cir. 2021) ..................................................................................13, 15, 21

*Koontz v. St. Johns River Water Mgmt. Dist.*,
　570 U.S. 595 (2013) .................................................................................................21, 22

*League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer*,
　814 Fed. Appx. 125 (6th Cir. June 24, 2020).........................................................18, 27, 28

*Leary v. Daeschner*,
　228 F.3d 729 (6th Cir. 2000) ..................................................................................... 10

*Libertas Classical Ass'n v. Whitmer*,
　No. 20-2085, 2020 WL 6886262 (6th Cir. Nov. 20, 2020) ........................................... 10

*McPherson v. Kelsey*,
　125 F.3d 989 (6th Cir. 1997) ..................................................................................... 11

*Metro. Detroit Plumbing & Mechanical Contractors Ass'n v. H.E.W*,
　418 F. Supp. 585 (E.D. Mich. 1976).............................................................................. 23

*Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*,
　945 F.2d 150 (6th Cir. 1991) ..................................................................................10, 11

*Minnesota Ass'n of Nurse Anesthetists v. Unity Hosp.*,
　59 F.3d 80 (8th Cir. 1995) ........................................................................................... 27

*Nasierowski Bros. Inv. Co. v. City of Sterling Heights*, 949 F.2d 890, 896 (6th Cir. 1991) ...................................................................................................... 23

*Nexus Gas Transmission, LLC v. City of Green, Ohio*,
757 Fed. Appx. 489 (6th Cir. 2018) ............................................................... 28

*Nikolao v. Lyon*,
875 F.3d 310 (6th Cir. 2017) ................................................................... 11, 18

*Overstreet v. Lexington-Fayette Urban County Gov't*,
305 F.3d 566 (6th Cir. 2002) ................................................................... 10, 27

*Pickney Bros. Inc. v. Robinson*, 194 F.3d 1313 (6th Cir. 1999) ........................... 23

*Reinoehl v. Whitmer*,
No. 1:21-cv-00061, 2021 WL 320727 (W.D. Mich. Jan. 22, 2021) .............. 18, 22, 23

*Rodriguez de Quijas v. Shearson/American Exp., Inc.*,
490 U.S. 477 (1989) ...................................................................................... 12

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
141 S. Ct. 63 (2020)............................................................................ 14, 15, 18, 19

*Smith v. Jefferson Cty. Bd. of School Com'rs*,
641 F.3d 197 (6th Cir. 2011) ....................................................................... 23

*S. Bay United Pentecostal Church v. Newsom*,
140 S. Ct. 1613 (2020)................................................................................... 18

*Speiser v. Randall*,
357 U.S. 513 (1958) ................................................................................ 21, 22

*TJM 64, Inc. v. Harris*,
475 F. Supp. 3d 828 (W.D. Tenn. 2020) .................................................. 12, 20

*Washington Univ. v. Catalona*,
437 F. Supp. 2d 985 (E.D. Mo. 2006), *aff'd*, 490 F.3d 667 (8th Cir. 2007).... 25

*Washington v. Glucksberg*,
521 U.S. 702 (1997) ...................................................................................... 13

*Washington v. Harper*,
494 U.S. 210 (1990) ................................................................................ 12, 13

**FEDERAL STATUTES**

21 U.S.C. § 360bbb-3.................................................................................. 4, 24, 25

iv

**REGULATIONS**

85 Fed. Reg. 18250, 18250-51 ................................................................................. 4

I.      **Introduction**

In requiring vaccination against COVID-19 for its students, faculty, and staff, Michigan State University has joined over 1,000 other institutions of higher education in following guidance from federal and state public health authorities to maximize the safety of its campus communities.

Plaintiff Jeanna Norris is a staff member who does not wish to be vaccinated. She alleges that a physician has told her that doing so is unnecessary because she tested positive for COVID-19 in November 2020. On behalf of a putative class, Norris seeks a preliminary injunction on the basis that being required by her employer to be vaccinated violates the Fourteenth Amendment and the Supremacy Clause.

MSU's lawful policy does neither. As the Court observed in its order denying Norris's Motion for Temporary Restraining Order ("TRO Order"), no fundamental right is implicated by MSU's policy. Accordingly, MSU's policy need only be reasonably related to a legitimate state interest, a standard it easily surpasses. And Norris's Supremacy Clause argument is a red herring for multiple reasons: the EUA statute does not prohibit vaccine requirements; Norris has not been deprived of her right to informed consent or refusal; and there is now a fully-FDA-approved vaccine in any event. Norris's inability to succeed on the merits of her claims requires denial of her requested injunction.

Moreover, as the TRO Order concluded, none of the remaining injunction factors favor Norris either. Her "injuries" are – at most – financial and not irreparable. Any burden on her is dwarfed by MSU's compelling interest (which is aligned with the public interest generally) in curbing the spread of COVID-19 and providing a safe campus environment for its students, faculty, and staff.

Norris's Motion for Preliminary Injunction should be denied.

## II.    Relevant Facts

### A.    COVID-19 Pandemic

#### 1.    COVID-19

"COVID-19 is an infectious disease caused by the novel coronavirus (SARS-CoV-2)."

Declaration of Marcus Zervos, M.D. ("Zervos Decl."), ¶ 14, attached hereto as **Exhibit A**.

COVID-19 spreads "primarily through respiratory droplets and through aerosol transmission."

*Id*. People of all ages can contract and transmit COVID-19. *Id*.

People who catch COVID-19 may suffer from immediate severe illness, have ongoing

health problems, extending several weeks or months, or die. *Id.* ¶ 15. It presents an "increased

risk of suffering" for individuals with certain underlying conditions. *Id.* ¶ 16. All individuals who

contract COVID-19 risk giving it to others "who may suffer severe illness or death." *Id.* ¶ 17.

#### 2.    History and Status of the Pandemic

According to the Michigan Department of Health and Human Services (MDHHS),

Michigan's first presumed-positive cases of COVID-19 were identified on March 10, 2020. *Id.*

¶ 18. Between March 10, 2020 and September 3, 2021, Michigan has had 955,640 confirmed

cases of COVID-19 with 20,367 deaths. *Id.* ¶ 19; *see also*,

https://www.michigan.gov/coronavirus/0,9753,7-406-98163_98173---,00.html (cases rose to

964,317 by September 10).

According to the CDC, an estimated 28.1% of Michigan's population has been infected

with COVID-19. *Id.* ¶ 19. Currently, the CDC advises that the risk of community transmission of

COVID-19 in Michigan is "high," with approximately 1578 cases per day. *Id*. ¶ 33. Michigan

has seen an increase in variants of the original COVID-19 strain. *Id.* ¶ 35. As of August 2021,

over 96% of the samples tested in Michigan are positive for a variant, and the Delta variant and Mu variant are both confirmed to be present in Michigan. *Id.*[1]

According to the New York Times, "over 700,000 cases of COVID-19 have been linked to colleges and universities in the U.S. since the pandemic began and more than 260,000 COVID-19 cases have been linked to colleges and universities just since January 1, 2021." *Id.* ¶ 23. As of May 26, 2021, MSU had reported 4,312 cases and as of August 31, 2021, Ingham County, Michigan (where MSU's primary campus is located) had reported 26,568 cases. *Id.*; *see also* https://msu.edu/together-we-will/testing-reporting/ (on campus cases increasing).

180,437 of Michigan's positive COVID-19 cases have been reported by individuals between the ages of 20 and 29—more than any other age demographic. *Id.* ¶ 20, 22.  A small number of those individuals have died from the virus. *Id.*

The CDC currently estimates that there have been approximately 39.5 million cases and over 640,000 deaths from COVID-19 in the United States. *Id.* ¶ 21.

### 3.   COVID-19 Vaccinations

Vaccinating individuals against COVID-19 currently is the leading prevention strategy to protect individuals from the virus and end the pandemic. *Id.* ¶ 24.

---

[1] Variants are different forms of the COVID-19 virus that arise as the virus mutates. *See* CDC, *What You Need to Know about Variants* (last visited Sept. 9, 2021), *avail. at:* https://www.cdc.gov/coronavirus/2019-ncov/variants/variant.html. The Delta variant "is currently the predominant variant of the virus in the United States" and "causes more infections and spreads faster than early forms of SARS-CoV-2, the virus that causes COVID-19." CDC, *Delta Variant: What We Know About the Science* (last visited Sept. 9, 2021), *avail. at:* https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html?s_cid=11621:cdc%20delta%20variant%20vaccine:sem.ga:p:RG:GM:gen:PTN.Grants:FY22. The World Health Organization has designated the Mu variant as a recently emerging fifth variant of interest because of its potential for high transmissibility and infectiousness. *See* WHO, *Weekly epidemiological update on COVID-19 - 31 August 2021* (last visited Sept. 9, 2021), https://www.who.int/publications/m/item/weekly-epidemiological-update-on-covid-19---31-august-2021.

There are three COVID-19 vaccinations available at no cost: the Pfizer-BioNTech vaccine (recently FDA approved as "Comirnaty"), the Moderna vaccine, and the Johnson & Johnson vaccine (collectively, "COVID-19 Vaccines"). *Id.* ¶ 25.

All three COVID-19 Vaccines have been studied in robust multi-centered, international, randomized-controlled trials. *Id.* ¶ 26. The clinical trials were done in over 100,000 subjects and the COVID-19 Vaccines have proven both effective and safe in millions of people. *Id.*

All three of the vaccines were initially authorized for use under an Emergency Use Authorization ("EUA") granted by the FDA. ECF No. 1, PageID.1-2. The FDA's ability to grant EUAs for medical inventions to combat the pandemic arose from a United States Department of Health and Human Services declaration issued at the outset of the pandemic. 85 Fed. Reg. 18250, 18250-51. An EUA is not issued unless certain showings are made. Interim clinical trial data must demonstrate that the product "may be effective" and that the "known and potential benefits outweigh the known and potential risks." 21 U.S.C. § 360bbb-3(c)(2)(A); FDA, *Emergency Use Authorization for Vaccines Explained*, https://www.fda.gov/vaccines-blood-biologics/vaccines/emergency-use-authorization-vaccines-explained (last visited Sept. 7, 2021). The EUA process for the COVID-19 Vaccines was "EUA on proverbial steroids." *Klaassen v. Trs. of Ind. Univ.*, No. 1:21-cv-238, 2021 WL 3073926, at *36 (N.D. Ind. July 18, 2021). Manufacturers were required to provide the "same level of endpoint efficacy data as required for full [FDA] approval" and sufficient safety data to demonstrate safety by clear and compelling evidence. *Id.* at *8.

As a result, the COVID-19 Vaccines are "proven safe and effective." Zervos Decl. ¶ 28. They were developed using science that has been around for decades, are not experimental, went through all the required stages of clinical trials, including "extensive testing and monitoring,"

and have received and continue to undergo "the most intensive safety monitoring in U.S. history." *Id.*; *see also Benefits of Getting a COVID-19 Vaccine* (last visited Sept. 7, 2021), *avail. at*: https://www.cdc.gov/coronavirus/2019-ncov/vaccines/vaccine-benefits.html. All three COVID-19 Vaccines have demonstrated a very high rate of efficacy. Zervos Decl. ¶ 27.

The Pfizer vaccine has now received full FDA approval for use in individuals at least 16 years old. FDA Biologics License Application Approval for BioNTech Manufacturing GmbH (dated Aug. 23, 2021), *avail. at*: https://www.fda.gov/media/151710/download. There is no difference in the formulation of the EUA-approved (BioNTech) or fully-approved (Comirnaty) vaccine. ECF No. 4-2, PageID.256 (the vaccines "have the *same formulation* and *can be used interchangeably* for provide the COVID-19 vaccination series;" the "licensed vaccine has the *same formulation* as the EUA-authorized vaccine and the products *can be used interchangeably* to provide the vaccination series *without presenting any safety or effectiveness concerns*. The products are legally distinct with certain differences *that do not impact safety or effectiveness*." (emphasis added)), *avail. at*: https://www.fda.gov/media/144414/download (last visited Sept. 4, 2021). In essence, full approval permits Pfizer to begin labeling its vaccine with the "brand name" Comirnaty, but the contents of a vial of BioNTech vaccine and a vial of Comirnaty vaccine are identical. https://www.nebraskamed.com/COVID/you-asked-we-answered-are-pfizers-comirnaty-and-biontech-covid-19-vaccines-the-same-or-different (last visited Sept. 4, 2021); https://heavy.com/news/comirnaty-vs-pfizer-vaccine-legally-distinct/ (last visited Sept. 4, 2021).

The Vaccines prevent the spread of COVID-19 and are effective against the variants that have been detected in Michigan. Zervos Decl. ¶ 29. An individual who has received a Vaccine is considered fully vaccinated two weeks after the second dose of a two-dose vaccine or two weeks

after a one-dose vaccine. *Id.* ¶ 30. Fully vaccinated individuals are less likely to catch COVID-19 and less likely to spread it to others. *Id.* ¶ 31. The Vaccines also help stop mutation of COVID-19, so variants will not emerge or spread. *Id.* ¶ 32, 34.

### 4.    COVID-19 Risks to and Caused by Unvaccinated Individuals

"COVID-19 is still a threat to people who are unvaccinated." *Benefits of Getting a COVID-19 Vaccine* (last visited Sept. 7, 2021), *avail. at*: https://www.cdc.gov/coronavirus/2019-ncov/vaccines/vaccine-benefits.html; Zervos Decl. ¶ 36. According to the MDHHS, from January to July 2021, unvaccinated Michiganders accounted for 98% of COVID cases, 95% of hospitalizations and 96% of deaths. *Id.* ¶ 37. On the date of this submission, the CDC announced data reflecting that unvaccinated individuals are eleven times more likely to die of COVID-19 than those who have been vaccinated. https://www.washingtonpost.com/health/2021/09/10/moderna-most-effective-covid-vaccine-studies/ (citing CDC, *Monitoring Incidence of COVID-19 Cases, Hospitalizations, and Deaths, by Vaccination Status — 13 U.S. Jurisdictions, April 4–July 17* (published Sept. 10, 2021), *avail. at*: https://www.cdc.gov/mmwr/volumes/70/wr/mm7037e1.htm?s_cid=mm7037e1_w).

Evidence shows that antibody responses following COVID-19 vaccination provide better activity against some circulating variants than does natural infection. *Id.* ¶ 39. One study found a two to six times better immune response in vaccinated individuals over those with natural immunity; another found immunization after COVID-19 recovery boosted immune response up to 1000 fold. *Id.* The likelihood of reinfection after COVID-19 is at least two times higher for individuals with only natural immunity than for immunized individuals. *Id.* ¶ 40. Reinfected patients can infect others. *Id.*

While individuals who have had COVID-19 might have some antibodies even after their infection has passed that provide protection against COVID-19, the amount of protection that

these individuals have against the virus varies from person-to-person and wanes over time. *Id.* ¶ 43. The FDA currently does not recommend the use of antibody tests to measure an individual's natural immunity after a COVID-19 infection because "[c]urrently authorized antibody tests have not been evaluated to assess the level of protection provided by an immune response to COVID-19 vaccination," and "[i]f antibody test results are interpreted incorrectly, there is a potential risk that people may take fewer precautions against [COVID-19] exposure." FDA Safety Communication, Antibody Testing Is Not Currently Recommended to Assess Immunity After COVID-19 Vaccination (issued May 19, 2021), *avail. at:* https://www.fda.gov/medical-devices/safety-communications/antibody-testing-not-currently-recommended-assess-immunity-after-covid-19-vaccination-fda-safety; Antibody Tests Should Not Be Your Go-To For Checking COVID Immunity (last visited Sept. 9, 2021), *avail. at:* https://www.npr.org/sections/health-shots/2021/08/28/1031287076/antibody-tests-should-not-be-your-go-to-for-checking-covid-immunity (explaining that antibody tests should not be used to assess COVID-19 immunity because, among other things, "the available antibody tests are not designed to specifically pick up whether you have enough of these protective antibodies, especially in the face of evolving variants"); Zervos Decl. ¶ 50-51. Additionally, as individuals' natural immunity decreases, their risk of contracting COVID-19 increases. *Id.* ¶ 43.

Immunization after natural infection with COVID-19 is recommended by the vast majority of experts, including every major medical society, the NIH, and the CDC, including the Advisory Committee on Immunization Practices (ACIP) which is an authoritative agency that makes recommendations for immunization to clinicians in the United States. *Id.* ¶ 41.

### 5.    Guidance for Institutions of Higher Education

The CDC and U.S. Department of Education ("ED") have provided specific guidance for institutions of higher education ("IHEs") to operate during the COVID-19 pandemic. *See* CDC

COVID-19 Info., *Colleges, Universities, and Higher Learning* (last visited Sept. 9, 2021), *avail. at*: https://www.cdc.gov/coronavirus/2019-ncov/community/colleges-universities/index.html; ED COVID-19 Handbook, Volume 3 – 2021 (dated June 2021), *avail. at*: https://www2.ed.gov/documents/coronavirus/reopening-3.pdf ("ED Handbook"). The CDC advises that IHEs should determine how to implement this guidance while considering: "the needs and circumstances of the IHE within the context of [its] local community"; "health equity considerations"; and state and local public health officials and applicable law. CDC, *Guidance for [IHEs]* (last visited Sept. 9, 2021), *avail. at*: https://www.cdc.gov/coronavirus/2019-ncov/community/colleges-universities/index.html ("CDC IHE Guidance"), Introduction; Section 4. IHEs are advised to make policy decisions "to protect the people who are not fully vaccinated." *Id*., Section 3.

According to the CDC, IHEs "play a critical role in offering and promoting vaccination to help increase the proportion of students, faculty and staff that are vaccinated to help slow the spread of COVID-19." *Id*., Section 1. ED instructs IHEs that "COVID-19 vaccination is the leading prevention strategy IHEs can use to return to normal operations." ED Handbook at 9.

    **B.**    **MSU**

MSU is a public research university located in East Lansing, Michigan. MSU has seven campuses, at which it serves more than 49,000 undergraduate and graduate students. MSU, *Community Campuses & Clinical Sites* https://mdadmissions.msu.edu/resources/campuses.html; https://msu.edu/about/facts; MSU *Campus Profile* https://msu.edu/about/facts. MSU has over 12,000 employees. MSU *Campus Profile* https://msu.edu/about/facts.

Norris has sued MSU's President and each member of its Board of Trustees in their official capacities. ECF No. 1, PageID.6.

### C.   MSU's COVID-19 Policy

MSU's COVID-19 policy for the Fall 2021 semester was first announced on July 30, 2021 by MSU's President, Dr. Samuel L. Stanley Jr., M.D. ECF No. 1-1, PageID.145-161. Dr. Stanley has a B.A. in Biological Sciences from the University of Chicago, an M.D. from Harvard University Medical School, and did postdoctoral work in immunology at the Washington University School of Medicine. https://president.msu.edu/meet-the-president/curriculum-cv.html. He is Board Certified in Internal Medicine and Infectious Diseases. *Id*. His extensive credentials relevant to infectious diseases include many years as a practicing physician. *Id*.

MSU's policy requires vaccination for all faculty, staff, and students who do not qualify for a medical or religious exemption. ECF No. 1-1, PageID.148-149. At least through September 15, 2021, MSU also requires face coverings indoors (regardless of vaccination status). *Id*. at 148.

With respect to MSU staff, MSU's Human Resources department has advised that: "MSU continues to make progress on plans for return to business locations . . . ." https://hr.msu.edu/news/coronavirus-faqs.html.

### D.   Plaintiff Jeanna Norris

Plaintiff Jeanna Norris is a supervisory Administrative Associate and Fiscal Officer. ECF No. 4-2, PageID.312;[2] Declaration of Douglas Landis ("Landis Decl.") attached hereto as **Exhibit B**, ¶ 5. Prior to the pandemic, Norris worked on MSU's main campus in East Lansing. *Id.* at 6. She has worked remotely since MSU largely transitioned to remote work in March 2020 due to the pandemic. *Id*. at 7. Norris is not formally classified as a "remote" employee. *Id.* at 8.

---

[2] Norris's Complaint is not verified. Therefore, none of the factual allegations in her Motion for Preliminary Injunction may properly be considered evidence unless they are otherwise supported by publicly available information or an affidavit given under oath. The Declaration of Drs. Bhattacharya and Kulldorff, on which Norris extensively relies, indicates that it reflects sworn testimony but also is not signed by either declarant. ECF No. 4-2, PageID.222, 241.

Norris is permitted to come to campus without prior approval. *Id.* at 9. Other employees who work with Norris do come to work on campus voluntarily. *Id.* MSU has begun transitioning staff back to campus and, although Norris has not yet been asked to do so, it is MSU's intent and expectation that Norris will return to work in person. *Id.* at 10. The determination of when that will occur will be made by her supervisor who reviews the appropriateness of continued remote work on a monthly basis. *Id.* at 11.

Norris also seeks to represent a putative class of similarly situated individuals. She has not filed a Motion for Class Certification and appears to concede that at this juncture none is necessary. ECF No. 4-1, PageID.185. MSU disagrees that class treatment is appropriate but reserves its opposition for briefing on class certification in due course.

## III.    **Legal Standard**

Preliminary injunctions are "extraordinary remed[ies]" that courts should avoid entering "unless the movant carries [their] burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban County Gov't*, 305 F.3d 566, 573 (6th Cir. 2002) (citing *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000) (citations omitted)); *see also Libertas Classical Ass'n v. Whitmer*, No. 20-2085, 2020 WL 6886262, at *1 (6th Cir. Nov. 20, 2020). When considering a preliminary injunction, courts balance four factors: "(1) whether the movant has shown a strong likelihood of success on the merits; (2) whether the movant will suffer irreparable harm if the injunction is not issued; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuing the injunction." *Id*. (citing *Leary*, 228 F.3d at 736). These factors are "interrelated considerations that must be balanced together." *Commonwealth of Ky. v. Beshear*, 981 F.3d 505, 508 (6th Cir. 2020) (quoting *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991)). However, when the preliminary injunction is sought based on a

constitutional harm, "the likelihood of success on the merits often will be the determinative

factor." *Id*. (quoting *City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th

Cir. 2014) (en banc) (per curiam) (citation omitted)).

## IV.   Argument

### A.    Norris is unlikely to succeed on the merits.

#### 1.    Rational Basis Scrutiny applies to Norris's substantive due process claim.

Norris contends that MSU's vaccination policy "violates the liberty and privacy interests

that the Ninth and Fourteenth Amendments protect." ECF No. 4-1, PageID197.[3] As this Court

has already observed, rational basis scrutiny applies to vaccination requirements like MSU's.

ECF No. 7, PageID.346-347 (citing *Jacobson v. Massachusetts*, 197 U.S. 11 (1905)).

*Jacobson* was the first of what is now over a century's worth of authority upholding

government vaccination requirements in various contexts. *See, e.g. Nikolao v. Lyon*, 875 F.3d

310 (6th Cir. 2017) (rejecting First Amendment challenge to childhood vaccination requirement).

In *Jacobson*, the Supreme Court held that a state enactment mandating vaccination, and

subjecting objectors to fines or imprisonment, was a constitutional exercise of the state's police

powers to establish reasonable health laws to "protect the public health and the public safety."

---

[3] Norris has waived any Ninth Amendment claim by failing to identify any right that she contends MSU's policy violates that is not otherwise more directly protected by the Fourteenth Amendment. *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." (citation omitted)); *Ivy Room LLC v. City of Hazel Park*, No. 21-10910, 2021 WL 2177079, at *6 n.2 (E.D. Mich. May 28, 2021) (citing *McPherson*, 125 F.3d at 995-96). MSU therefore addresses Norris's claims under the Fourteenth Amendment. *See CH Royal Oak, LLC v. Whitmer*, 472 F. Supp. 3d 410, 414 (W.D. Mich. 2020) (instructing that "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment . . . must be the guide for analyzing these claims" (quoting *Albright v. Oliver*, 510 U.S. 266, 273 (1994))).

*Jacobson*, 197 U.S. at 25-26. The Court rejected the plaintiff's argument that the compulsory vaccination requirement was "unreasonable, arbitrary and oppressive" and therefore invaded his constitutionally protected liberty interest, and the Court reiterated the "fundamental principle" that individual liberty is not boundless and must yield "to secure the general comfort, health, and prosperity" of the greater citizenry. *Id.* at 26. Because the challenged law had a "real or substantial relation to the protection of the public health and the public safety," it was reasonable and, therefore, constitutional. *Id.* at 31.

Notwithstanding *Jacobson* and the numerous cases that have cited it in the last 116 years, Norris makes essentially no attempt to argue that MSU's vaccination requirement fails rational basis scrutiny. ECF No. 4-1, PageID.196-204;[4] *see TJM 64, Inc. v. Harris*, 475 F. Supp. 3d 828, 834 (W.D. Tenn. 2020) ("A law involving public health emergencies will only be struck down if it has "no real or substantial relation to those objects, or is beyond all question, a plain, palpable invasion of rights secured by the fundamental law."). Norris's failure to confront rational basis scrutiny is fatal to the likelihood of success on the merits of her substantive due process claim.

Instead, Norris urges that strict scrutiny is warranted, without citing any authority suggesting that she has a fundamental right to defy an employer's vaccination requirement. *See* ECF No. 4-1, PageID.196-198. Instead, she relies upon on cases recognizing rights to bodily autonomy and to refuse medical treatment under certain circumstances. ECF No. 4-1, PageID.196-197 (citing *Washington v. Harper*, 494 U.S. 210 (1990) (*allowing* administration of

---

[4] Norris stops short of contending *Jacobson* is not good law, but suggests in passing that one of its progeny, *Buck v. Bell*, 274 U.S. 200 (1927), "cannot possibly still be." ECF No. 4-1, PageID.203. While MSU agrees that *Buck*'s holding is objectionable, this Court cannot reject *Jacobson*, which is controlling, on the basis that the analysis in *Bell* was subsequently repudiated (though never overturned). *Rodriguez de Quijas v. Shearson/American Exp., Inc.*, 490 U.S. 477, 484 (1989).

antipsychotic medication to individual awaiting trial); *Cruzan v. Dir., Mo. Dep't of Public Health*, 497 U.S. 261 (1990) (recognizing right to refuse unwanted hydration and nutrition); *Washington v. Glucksberg*, 521 U.S. 702 (1997) (banning physician assisted suicide)). But these cases do not support Norris's claims. First, none addresses mandatory vaccination, so none controls over the factually analogous *Jacobson*. Additionally, unlike Norris, who can receive a COVID-19 vaccine or choose to work elsewhere, the plaintiff in each case was, in fact, unable to exercise a choice as to whether or not to receive the medical treatment at issue. Finally, *Harper* and *Glucksberg* actually both permitted the government to "intrude" upon the rights at issue.

Critically, none of those cases recognizes the right at issue as fundamental or as requiring strict scrutiny. So even if the Court stretched those cases to apply here, they do not justify the level of scrutiny Norris is urging. Indeed, despite exhaustive analysis, in the face of similar arguments about bodily integrity and rights to refuse medical treatment, the *Klaassen* court found no fundamental right for students to refuse vaccination under a similar policy. *Klaassen,* 2021 WL 3073926, at *15-24 (describing "over a century's worth of rulings saying there is no greater right to refuse a vaccination than what the Constitution recognizes as a significant liberty [interest]"); *Klaassen v. Trs. of Ind. Univ.*, 7 F.4th 592, 593 (7th Cir. 2021) (recognizing right to bodily integrity but holding that it is not implicated by vaccination policy). Cases in this Circuit reach the same conclusion with respect to the limits of the right to bodily integrity. *See Guertin v. State*, 912 F. 3d 907, 922 (6th Cir. 2019) (even "upon showing of a deprivation of a constitutionally protected liberty interest," government action may be upheld in the absence of "conscience-shocking conduct").

Norris's attempt to distinguish her case from *Jacobson* is unsuccessful. ECF 4-1, PageID.201. For example, she suggests that *Jacobson* differs from present circumstances because

there, "the city was held to have established a cognizable and compelling interest in mandating the vaccine." ECF No. 4-1, PageID.201. The same is true here: our Supreme Court has recognized that "[s]temming the spread of COVID-19 is unquestionably a compelling interest." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020). Next, Norris suggests that she differs from Mr. Jacobson because he "had not consulted a doctor and did not have natural immunity." ECF No. 4-1, PageID.201. But even if those factual distinctions are accurate, they do not justify Norris's giant leap to suggesting that MSU can therefore have *no* legitimate interest in requiring her vaccination, much less that doing so is "cruel and inhuman." ECF No. 4-1, PageID.202. To the contrary, as explained *infra*, there is ample scientific justification for requiring vaccination of previously infected individuals.

Norris's efforts to distance herself from *Klaassen* fare no better. ECF 4-1, PageID.203-204. As an initial matter, the *Klaassen* court did in fact make findings relevant to Norris's natural immunity arguments. *Klaassen*, 2021 WL 3073926, at *27 ("A peer-reviewed study from scientists (issued July 8, 2021), found that the Delta variant has mutations that allow it to evade certain natural antibodies, with vaccination providing the best protection."); n.80 ("the data show . . .those who had vaccination after natural infection maintained 100 percent antibodies" to the Beta and Delta variants a year later, as compared with only 50 percent and 47 percent, respectively, of individuals who retained antibodies to the variants after only natural infection). Neither is it persuasive to suggest that *Klassen*'s legal analysis is inapplicable to Norris because she is not a student.[5] ECF No. 4-1, PageID.203-204. But most importantly, as this Court recognized, *Klaassen*

---

[5] In fact, *Klaassen* upheld Indiana University's mandatory vaccination requirement for students in spite of the students' argument that its older-aged faculty and staff faced *higher* risks of serious consequences from contracting COVID-19. *See, e.g.*, *Klaassen*, 2021 WL 3073926, at *7, 28.

is persuasive authority because it considered – and rejected – the very claim that Norris is making here: that her substantive due process rights are violated by a public university's vaccination requirement. ECF No. 7, PageID.347 (citing *Klaassen*, 2021 WL 3073926 and *Klaassen*, 7 F.4th 592 (denying injunction pending appeal)); *see also Harris v. Univ. of Mass.*, No. 21-cv-11244, 2021 WL 3848012, at *1 (D. Mass. Aug, 27, 2021) (denying injunction of public university vaccination requirement and dismissing complaint).

### a. MSU's policy is reasonably related to MSU's compelling interest in protecting its students, faculty, and staff from COVID-19.

In the face of a century's worth of authority and a recent well-reasoned decision rejecting a similar claim, Norris leans heavily on arguments that MSU's policy is neither justified nor narrowly tailored because it requires all employees to be vaccinated regardless of prior infection. ECF No. 4-1, PageID.197-201. Not only does this argument invoke the wrong standard of review, it incorrectly suggests that there can be no government interest in vaccination of previously-infected individuals. *Id.*[6] We address both points below.

Although MSU needs only a legitimate interest supporting its vaccination policy, "[s]temming the spread of COVID-19 is unquestionably" compelling. *Roman Cath. Diocese of Brooklyn*, 141 S. Ct. at 67. Apparently conceding that MSU has an interest in "promoting immunity on campus," Norris attempts to re-cast MSU's interest more narrowly, arguing that MSU cannot have a compelling interest in promoting that immunity by requiring vaccination of "employees who already have natural immunity – particularly those who can demonstrate such

---

[6] Just yesterday, President Biden announced a vaccination requirement for all federal employers and contractors, while OSHA will require vaccination (or weekly testing) for all private employers with at least 100 employees. NPR, *Biden Will Announce Rules to Boost Vaccine Requirements As A Condition of Employment*, https://www.npr.org/2021/09/09/1035149651/biden-will-require-vaccines-for-federal-workers-as-part-of-a-new-covid-strategy (last updated Sept. 9, 2021); https://www.whitehouse.gov/covidplan/.

immunity through antibody screenings." ECF No. 4-1, PageID.198-200. Putting aside the question of whether MSU's interest must be so particularized, its interest in having employees who were previously infected with COVID-19 receive a vaccination is legitimate.

The record contains ample evidence supporting MSU's policy from its expert, Dr. Marcus Zervos. Dr. Zervos is a practicing infectious disease physician (with many of the same qualifications as MSU's President) who is well qualified to opine on the assertions made by Norris and her experts.[7] Zervos Decl. ¶ 3-13. According to Dr. Zervos, the weight of the currently-available evidence suggests that vaccines provide broader protection than natural immunity alone and for a longer period of time, and that the risk of side-effects—which is very small—is no greater in persons with previous infections. *Id*. ¶ 39, 43-46, 49, 52-71. It is Dr. Zervos's opinion that, based on the current evidence, mandating vaccines for previously infected individuals will reduce the spread of COVID-19. *Id*. ¶ 29-32, 40-41, 50-53, 72-76. Dr. Zervos's declaration also specifically refutes Norris's key contentions, including, for example:

- The CDC and MDHHS recommend vaccination for those who have been infected naturally with COVID-19. There is emerging evidence that vaccination provides additional protection against the virus and a broader spectrum of protection to variants than natural infection. *Id*. ¶ 39, 52-62.

- While individuals who have had COVID-19 might have some antibodies even after their infection has passed that provide protection against COVID-19, the amount of

---

[7] Norris's experts' declaration omits key information required by Federal Rule of Civil Procedure 26(a)(2)(B), including disclosure of publications and any prior expert testimony. MSU's initial research reflects that Dr. Bhattacharya has served as an expert in at least 18 cases challenging COVID-19 precautions (e.g. masking, dining restrictions), but no court has relied on his scientific opinions to invalidate COVID restrictions. MSU located no prior expert testimony by Dr. Kulldorff.

protection that these individuals have against the virus varies from person-to-person and wanes over time. As these individuals' natural immunity decreases, their risk of contracting COVID-19 increases. *Id.* ¶ 43-44, 46.

- Antibody levels may not develop at all in some individuals and may fall as early as 90 days after COVID-19 infection. *Id*. ¶ 44, 49.

- The finding of reinfections after natural infection with COVID-19 suggest that long term immunity (antibody and cellular) does not occur and cellular immunity alone is not sufficient to protect an individual from subsequent infection. *Id*. ¶ 45.

- Norris should be vaccinated because vaccination will result in boosted immunity that will prevent infection with variants. *Id*. ¶ 49.

- There is no evidence from the literature, clinical trial information or published real world experience with vaccines that Norris would be expected to have a more serious side effect of the vaccine since she had COVID-19. *Id*.

- Using a serologic test to equate to immunity is not evidence-based and not recommended by the CDC or the FDA. *Id.* ¶ 51.

- There is no basis to contend that natural immunity may last for years. *Id.* ¶ 65.

- The "Israel study" has a variety of important limitations that caution against relying on it to defy federal and state guidance. *Id.* ¶ 64.

- The risks of COVID-19 cannot be appropriately characterized as "minimal" for any individual. *Id.* ¶ 67-69. The risk of COVID-19 far outweighs the risk of possible adverse effects from vaccination, even for those who have previously contracted COVID-19.  *Id.* ¶ 71.

*See generally* Zervos Decl.; *supra*, at 2-3, 5-7; *see also, Nikolao*, 875 F.3d at 318 ("The importance of extensive vaccination should not be understated . . . .").

It is on precisely these points that Norris invites a battle of the experts. Most notably, Norris's experts contend that vaccination provides no additional protection to previously infected individuals and that immunity gained through infection is equivalent or superior to immunity acquired through vaccination. ECF No. 4-1, PageID.197-199; ECF No. 4-2, PageID.226-230. Of course, MSU's expert strongly disagrees that "multiple, extensive, peer-reviewed studies . . . have concluded overwhelmingly" that natural immunity is equal to or greater than vaccine immunity. *See, e.g.*, Zervos Decl. ¶ 45, 52-65. But even assuming for the sake of argument that both views are fair readings of the scientific literature (a point that MSU's expert disputes), to demonstrate a likelihood of success on the merits, Norris must establish that MSU's policy judgment on this issue is illegitimate and unreasonable—a position that is plainly not true in light of the currently available scientific evidence. Weighing that evidence is exactly the sort of evaluation that courts are discouraged from undertaking. *S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613-14 (2020), Roberts, C.J., concurring (where "broad limits" of policymaking "are not exceeded, they should not subject to second-guessing" by judiciary, which "lacks expertise to access public health"); *League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer*, 814 Fed. Appx. 125, 129 (6th Cir. June 24, 2020) ("Shaping the precise contours of public health measures entails some difficult line-drawing. Our Constitution wisely leaves that task to officials directly accountable to the people."); *Reinoehl v. Whitmer*, No. 1:21-cv-00061, 2021 WL 320727, at *4 (W.D. Mich. Jan. 22, 2021) ("It is not in the public interest for this Court to override and/or modify the decisions and judgments rendered by public officials concerning the current pandemic."); *Klaassen*, 2021 WL 3073926, at * 43 (collecting Supreme Court cases,

including *Roman Cath. Diocese of Brooklyn*, 141 S. Ct. at 68 ("Members of this Court are not public health experts)).

Norris's "Supplement" perfectly illustrates why this is the case. ECF No. 8. That filing asks the Court to make a finding of unconstitutionality based on two minutes of hearsay from the Squawk Box television show and information about an unrelated private employer's COVID-19 policy. ECF No. 8, PageID.352-357. Based on these two items, Norris insists that MSU's different policy judgment is "flawed," "heedless" and constitutes "willful blindness." ECF No. 8, PageID.354-355. At most, what Norris's supplemental "evidence" indicates is that there is continuing scientific debate and discussion on this issue.[8] But it is MSU's position that is in alignment with the nearly unanimous position of the qualified medical professionals in this area, including all relevant federal public health authorities. The arrows Norris flings at MSU are similarly aimed at the FDA, CDC, and MDHHS, and the many infectious disease experts like Dr. Zervos who do not believe the evidence supports her position. But this Court need to wade into the scientific debate so long as MSU's position is rationally supported, a point even Norris should not contest in good faith.

Beyond the overwhelming and credible scientific rationale, practical considerations also support MSU's approach. Norris invites MSU to put itself in the untenable position of doing the following: rejecting federal guidance cautioning that antibody test results are a not reliable predictor of COVID-19 immunity; tracking the date of every COVID infection among its staff;

---

[8] To wit, Dr. Gottlieb's "bombshell" interview also included the following statements that are directly contrary to Norris's position and consistent with Dr. Zervos's opinion instead: "I'd be careful about concluding that natural immunity is more robust. . . . The balance of the evidence doesn't suggest that. That one study [the Israel study], seemed to suggest that, there were a lot of methodological limitations in that study . . . . I still think the balance of the evidence tips in favor of the vaccine." https://twitter.com/i/status/1432321613467357187.

requiring periodic antibody testing of those individuals; monitoring those results for declining antibodies; and determining when immunization is necessary – a point about which, as demonstrated by this lawsuit – the staff member is likely to disagree in any event. Rational basis scrutiny does not require MSU to administer such a convoluted procedure. Rather, it is plainly rational for MSU to rely on federal and state guidance, and the science underpinning that guidance, in concluding vaccination exemption is not justified based on prior COVID infection or antibody tests that federal health officials recommend against using.

Next, Norris criticizes MSU for not listing every justification for its policy decision on its website, going so far as to suggest that MSU's approach is outside "the mainstream of COVID public health policy." ECF No. 4-1, PageID.197-199; ECF No. 8, PageID.356. The insinuation is that unless MSU has debunked, in writing, every basis on which a person could disagree with its policy, it is unconstitutional. Yet Norris cites no case establishing such a standard.[9] Take for example Norris's acrimony at MSU's "blithe statement" that vaccination provides additional protection for previously infected individuals. ECF 4-1, PageID.197. While Norris's experts disagree with this conclusion, the CDC sides with MSU. https://www.cdc.gov/coronavirus/2019-ncov/vaccines/faq.html. The same is true for Norris's contentions that: vaccination is unjustified since vaccinated individuals can spread COVID-19; some vaccines (including two not in use in the United States) allegedly have lower efficacy rates than natural immunity; and the lack of evidence about the durability of natural or vaccine immunity renders vaccination unreasonable. ECF No. 4-1, PageID.199-200. In sum, MSU can hardly be found

---

[9] And indeed, it was recently rejected. *TJM 64*, 475 F. Supp.3d at 836 ("the Fourteenth Amendment's arbitrary and capricious standard does not require such data-driven, scientifically rigorous decision making from local officials").

unreasonable by creating a policy consistent with CDC and other guidance, notwithstanding Norris and her experts' rejection of the CDC's recommendations.[10]

Finally, Norris's assertion that MSU's policy "lacks a valid public-health basis" is simply bizarre. ECF No. 4-1, PageID.198-199. "[P]reventing hospitalizations, severe disease and death" are certainly legitimate public health goals. *Id.* To the extent Norris intends to suggest that the policy cannot be legitimate unless it protects the community at large (rather than just the individuals being vaccinated), it certainly does that too. https://msu.edu/together-we-will/faqs/ ("In July, as MSU medical experts monitored the increased spread of the Delta variant, new studies demonstrated both unvaccinated and vaccinated individuals can transmit the disease to those who cannot currently be vaccinated, including children less than 12 years old and immunocompromised individuals. Many employees have children or loved ones at home who would be put at risk if the virus entered their home."). *See, Harris,* 2021 WL 3848012, at *6 (university vaccination requirement "protects not only the vaccinated persons but also those who come in contact with them" (quoting *Klaassen,* 7 F.4th at 593)); Zervos Decl. ¶ 29, 31, 76.[11]

### 2.    MSU's policy does not impose an unconstitutional condition.

Norris's unconstitutional conditions argument fails for two reasons. ECF No. 4-1, PageID.204-210. First, for the unconstitutional conditions doctrine to apply, Norris must identify an enumerated constitutional right that she is being coerced to relinquish. *Koontz v. St. Johns*

---

[10] Indeed, Drs. Bhattacharya and Kulldorff are outspoken critics of other U.S. COVID-19 mitigation policies, advocating against the 2020 lockdowns on the controversial basis that widespread infection among unvaccinated persons offers more protection for the population as a whole. *See* https://www.infectioncontroltoday.com/view/great-barrington-declaration-covid-lockdowns-were-unnecessary.

[11] The fact that MDHHS allows some immunity-based exemptions from certain non-COVID childhood vaccinations in its regulatory code (which is not a statute, as Norris contends) has no bearing on MSU's own conclusion about the prudence of such an exemption in the context of transmission of COVID-19 on its college campus. *Contra* ECF No. 4-1, PageID.200.

*River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013). No such right is at issue here. She does not have a fundamental right to refuse a vaccination requirement and she does not have a fundamental right to public employment. This is fatal to her claim. Second, even if she had identified such a right, the choice the vaccine directive requires her to make is not coercive, as is required to state a valid unconstitutional conditions claim. *See Klaassen*, 2021 WL 3073926, at *25 ("hard choice doesn't amount to coercion"). Plaintiff argues that there should be no coercion requirement (a position that she concedes is "less appreciated in legal circles") but that is not the law. *Id.*; *contra* ECF 4-1, PageID:204.[12]

To the extent Plaintiff is attempting to state a procedural due process claim, that fails as well. A procedural due process claim requires her to establish "(1) a life, liberty or property interest requiring constitutional protection, (2) a deprivation of that interest, (3) that the deprivation occurred without adequate process." *Reinoehl*, 2021 WL 320727, at *3.  Here, Norris asserts both a liberty interest in her bodily integrity and a property interest in her career. ECF No. 4-1, PageID.204. Norris can establish no deprivation of her interest in bodily integrity for the reasons set forth, *infra*, § IV.A.3.b. And even assuming for the sake of argument that she has some sort of interest in her "career" (an issue the Court need not resolve), a procedural due process claim falls to the fact that Norris's alleged injury arises from a policy of general

---

[12] *Speiser v. Randall*, 357 U.S. 513 (1958), is inapposite. ECF No. 4-1, PageID.205-206. There, the Supreme Court's analysis centered on the fact that California's tax exemption regime required subjective judgments about whether veterans had engaged in speech that would violate an affirmation that they had not advocated for overthrow of the government – effectively chilling what might be otherwise protected speech. *Speiser*, 357 U.S. at 526 ("The vice of the present procedure is that, where particular speech falls close to the line separating the lawful and the unlawful, the possibility of mistaken factfinding . . . will create the danger that the legitimate utterance will be penalized."). No such line drawing around protected activity is required by MSU's policy. Moreover, *Speiser* does not stand for the proposition that the burden of proof may never be shifted toward the interest holder, and in fact stated that such an allocation is appropriate "in most circumstances." *Id.* at 524-25.

applicability. In enacting the policy, MSU made a "[g]overnmental determination[] of a general nature" that affects all MSU students, faculty, and staff "equally." *Nasierowski Bros. Inv. Co. v. City of Sterling Heights*, 949 F.2d 890, 896 (6th Cir. 1991). MSU's institution of its generally applicable vaccination policy, therefore, "do[es] not give rise to a due process right to be heard." *Id.*; *see also, e.g.*, *Pickney Bros. Inc. v. Robinson*, 194 F.3d 1313 (6th Cir. 1999); *Smith v. Jefferson Cty. Bd. of School Com'rs*, 641 F.3d 197 at 216-17 (6th Cir. 2011); *Reinoehl*, 2021 WL 320727, at *3 (confirming no pre- or post-deprivation hearing is required "in those circumstances where the State has issued a generally applicable law or order") quoting *Hartman v. Acton*, No. 2:20-CV-1952, 2020 WL 1932896, at *7 (S.D. Ohio Apr. 21, 2020)).

Norris argues that she is being denied adequate process because MSU's policy "amounts to" the creation of an irrebuttable presumption that those with "natural immunity" are not eligible for a medical exemption. ECF 4-1, PageID.207. By making this argument, however, Norris is conceding the critical point. There is no individualized determination here that would require additional process beyond the decision, applicable to everyone within the MSU community, that those with prior COVID-19 infection are not exempt from the vaccine requirement on that basis. *Darks v. City of Cincinnati*, 745 F.2d 1040, 1044 (6th Cir. 1984) (rejecting procedural due process challenge where all felons were denied dance hall licenses). The Sixth Circuit has held that when such a uniform rule is rationally related to legitimate state objectives, it cannot be attacked on due process grounds "merely by labeling the rule [as] an irrebuttable presumption." *Id.*; *see also e.g.*, *Metro. Detroit Plumbing & Mechanical Contractors Ass'n v. H.E.W*, 418 F. Supp. 585, 589-90 (E.D. Mich. 1976) (plaintiffs failed to demonstrate a likelihood of success on their due process claim where the alleged irrebuttable presumption was wholly rational and promoted the purpose of the resolution at issue).

Finally, to the extent Plaintiff is claiming that she is entitled to some additional process prior to discipline for violation of MSU's vaccination policy, her complaint is entirely speculative, premature, and cannot provide the basis for the imposition of a preliminary injunction. She has not, and cannot, allege that she would be disciplined without being offered further process.

### 3.   MSU's policy is not preempted by the EUA Statute.

#### a.   The EUA Statute does not prohibit employer vaccination requirements.

Norris's preemption claim contends that the statute allowing the FDA to authorize certain medical interventions for emergency use "actually conflicts" with MSU's policy. ECF No. 4-1, PageID.210-213. Not so. The EUA provisions in 21 U.S.C. § 360bbb-3 address powers and responsibilities of the Secretary of the Department of Health and Human Services, not employers like MSU. *See, e.g.*, 21 U.S.C. § 360bbb-3(e) ("the Secretary . . . shall . . ."); *Bridges v. Houston Methodist Hosp.*, No. H-21-1774, 2021 WL 2399994, at *2 (S.D. Tex. June 12, 2021) (EUA statute "neither expands nor restricts" the responsibility of employers); *Klaassen*, 2021 WL 3073926, at *25 ("the informed consent requirement under the EUA statute only applies to medical providers").

Instead, the statute requires medical providers to obtain informed consent from those receiving an EUA vaccination (including advising them of their right to refuse) and to provide those individuals with the risks and benefits of the vaccination. *Klaassen*, 2021 WL 3073926, at *25 (quoting 21 U.S.C. § 360bbb-3(e)(1)(A)(ii)). There is no evidence suggesting that any medical provider from whom Norris might obtain a vaccination would bypass these informed consent requirements. That is, to the extent Norris were to receive any of the three EUA-

authorized vaccinations, that would occur in compliance with 21 U.S.C. § 360bbb-3.[13] Indeed,

Norris's filings in this case demonstrate that she is aware of the EUA statute and has reviewed

the fact sheets on the vaccines. Norris cannot contend at this point that she could actually receive

a vaccination without having provided informed consent.

> **b.    Norris has not been deprived of informed consent or her ability to refuse the vaccination.**

More fundamentally, MSU's vaccination policy does not preclude Norris from

"accept[ing] or refus[ing] administration of" the COVID-19 vaccine. 21 U.S.C. § 360bbb-

3(e)(1)(A)(ii)(III). While MSU's policy requires vaccination or an exemption as a condition of

employment, that requirement is not tantamount to Norris being "forced to take the vaccine."[14]

*Contra* ECF 4-1, PageID.205. Norris "can freely choose to accept or refuse a COVID-19

vaccine; however, if she refuses, she will simply need to work somewhere else." *Bridges*, 2021

WL 2399994, at *2. Norris's attempt to conflate her ability to refuse the vaccine generally with

her ability to refuse the vaccine *and* remain employed at MSU is a bridge too far. The EUA

statute does not preclude employers from requiring EUA-authorized vaccines; it merely requires

---

[13] Norris's invocation of Nuremburg to liken herself to a "human subject" is inappropriate. ECF 4-1, PageID.215; *Bridges*, 2021 WL 2399994, at *2 ("Equating [a vaccination requirement] to medical experimentation in concentration camps is reprehensible."). Moreover, "[t]here is no private right of action for an alleged violation of international law for the protection of human research subjects based upon the Declaration of Helsinki and the Nuremberg Code." *Ammend v. BioPort, Inc.*, 322 F. Supp. 2d 848, 872 (W.D. Mich. 2004); *see also Wash. Univ. v. Catalona*, 437 F. Supp. 2d 985, 1000 (E.D. Mo. 2006), *aff'd*, 490 F.3d 667 (8th Cir. 2007).

[14] It is worth noting that the Office of Legal Counsel reached the same conclusion. https://www.justice.gov/olc/file/1415446/download at 10-13. Though Norris insists this Opinion is "irrelevant," she discusses it extensively in her filings. ECF 1, PageID.40-44; ECF 4-1, PageID.212-215. MSU agrees that the Opinion is not binding on this Court and does not contend that the Opinion alone establishes that the EUA statute does not preempt MSU's policy. Rather, as described above, there is no preemption because the EUA statute does not prohibit employer vaccination requirements and because Norris is not being deprived of informed consent or her ability to refuse the vaccine.

that employees are advised of the EUA-status of those vaccines – by their medical providers – before deciding whether to receive a vaccination so that they may retain their employment.

### c.    FDA's approval of the Pfizer vaccine undermines Norris's claim.

Finally, Norris's concerns about the vaccines' EUA status are obviated by the fact that the Pfizer vaccination, which is available at MSU, has obtained full approval by the FDA. ECF No. 4-2, PageID.298-310; https://pharmacy.msu.edu/msu-health-care-pharmacy-covid-19-vaccine (last visited Sept. 8, 2021). Presumably aware that this fact fully and finally undermines her EUA-related objections, Norris insists that her opposition remains valid if she receives a Pfizer vaccine with BioNTech packaging rather than a Comirnaty label. ECF No. 4-1, PageID.209-210. This argument defies facts. The FDA has confirmed that the vaccines are the same. ECF No. 4-2, PageID.256 (the vaccines "have the *same formulation* and *can be used interchangeably* for provide the COVID-19 vaccination series;" the "licensed vaccine has the *same formulation* as the EUA-authorized vaccine and the products *can be used interchangeably* to provide the vaccination series *without presenting any safety or effectiveness concerns*. The products are legally distinct with certain differences *that do not impact safety or effectiveness*.") (emphasis added), *available at*: https://www.fda.gov/media/144414/download (last visited Sept. 4, 2021). The FDA's description of the vaccines as "legally distinct" from a regulatory perspective does not result in an actual legal distinction that saves Norris's claim here. *Contra* ECF No. 4-1, PageID.211.[15]

For all of these reasons, Norris is not likely to succeed on the merits of her claim that MSU's policy is preempted by the EUA statute.

---

[15] Moreover, beyond noting that the BioNTech vaccines were more readily available at the time of Comirnaty's approval (ECF 4-1, PageID.209) (a logical consequence of Comirnaty just having been approved), Norris has not established that she would be actually unable to obtain doses of the vaccine with her preferred Comirnaty label if she so chose.

**B.    Norris has made no showing of irreparable harm.**

The Court has already disposed of Norris's claimed irreparable harm. ECF No. 7,

PageID.349-350. Any damages Norris will suffer if she is dismissed from MSU for a reason the

Court later finds unconstitutional "can be calculated to an exact amount." ECF No. 7,

PageID.351. Money damages of this type are far from adequate to sustain a preliminary

injunction. *Overstreet*, 305 F.3d at 579 ("the loss of a job is quintessentially reparable

by money damages") quoting *Minnesota Ass'n of Nurse Anesthetists v. Unity Hosp.,* 59 F.3d 80,

83 (8th Cir. 1995)). Neither can the anxiety that Norris alleges on behalf of herself and her

family be deemed irreparable. ECF No. 4-2, PageID.313-314. *King v. Harwood*, No. 3:15-CV-

762-GNS, 2021 WL 6029633, at *10-11 (W.D. Ky. Dec. 5, 2017) (general claims of anxiety do

not satisfy the "purposefully high standard of irreparability"); *Am. Fed'n of Grain Millers (AFL-

CIO), Local 3 v. Kellogg Co.*, No. K89-64 CA, 1989 WL 230574, at *2 (W.D. Mich. Nov. 3,

1989) ("stress [and] anxiety . . . are not irreparable injury as a matter of law"). Employees are

required to comply with many mandatory policies with which they may not agree and which may

even upset them (e.g. no smoking at work, no personal phone calls from family members). This

frustration does not justify an injunction.

Norris's failure to demonstrate irreparable harm requires denial of an injunction. *D.T. v.

Sumner Cty. Sch.*, 942 F.3d 324, 326-27 (6th Cir. 2019) ("even the strongest showing on the

other three [injunction] factors cannot 'eliminate the irreparable harm requirement.' That factor

is indispensable: if the plaintiff isn't facing imminent injury there's no need to grant relief *now* as

opposed to at the end of the lawsuit." (quoting *Friendship Materials, Inc. v. Mich. Brick, Inc.*,

679 F.2d 100, 105 (6th Cir. 1982) (emphasis in original)).

**C.    The harm to MSU if its policy is enjoined outweighs any harm Norris might suffer.**

MSU's interest and obligation in keeping its students, faculty, and staff safe, alive, and healthy far outweighs the potential harm to one individual in either receiving a vaccination, seeking an exemption, or finding alternate employment. *See, e.g.*, *League of Indep. Fitness Facilities & Trainers, Inc.*, 814 Fed. Appx. at 129 ("[e]njoining the actions of elected state officials, especially in a situation where an infectious disease can and has spread rapidly, causes irreparable harm."). Norris's assertion that MSU has no interest in enforcing its policy overlooks the risk to the MSU community should the policy be enjoined. ECF No. 4-1, PageID.215. The vaccines are currently the most effective tool MSU has to help stem the spread of the pandemic on its campus and in the surrounding community. *See, e.g.*, Zervos Decl., ¶¶ 24, 29, 72.

**D.    The public interest supports MSU's Policy.**

The public interest also supports upholding MSU's policy. The Court must consider the effects of enjoining the policy on the safety and health of others.  *See, e.g., Nexus Gas Transmission, LLC v. City of Green, Ohio*, 757 Fed. Appx. 489 (6th Cir. 2018) (The public interest factor "primarily addresses impact on non-parties.") quoting *Hunter v. Hamilton Cty. Bd. of Elections*, 635 F.3d 219, 244 (6th Cir. 2011)).  Here, the harm to MSU and the public interest are "closely related." *See, e.g.*, *League of Indep. Fitness Facilities & Trainers,* 814 Fed. Appx. at 129-30. Enjoining MSU's policy would not only increase the risk of infection for Norris, it would also increase the risk of transmission of COVID-19 among all other MSU students, faculty, and staff. *See, e.g.*, Zervos Decl., ¶ 29, 72; *League of Indep. Fitness Facilities & Trainers,* 814 Fed. Appx. at 129-30 (noting that, "[t]o date, [COVID-19] has infected thousands of Michiganders, and it has shown the potential to infect many more"). This, in turn, increases

the risk to the communities where the campuses sit. Over 40,000 students have come to East Lansing from all over the state and country to attend MSU.

The public interest in reducing the risk of transmission among MSU students, faculty, and staff and surrounding communities outweighs any interest asserted by Norris, especially because she has failed to establish a likelihood of success on the merits. *Altman v. Cty. of Santa Clara*, 464 F. Supp. 3d 1106, 1134 (N.D. Cal. 2020) ("[T]he public's interest in controlling the spread of COVID-19 outweighs its interest in preventing the constitutional violations alleged here, especially given that Plaintiffs have failed to establish a likelihood of success on the merits."). Therefore, the public interest supports upholding MSU's policy.

## V.     Conclusion

Defendants respectfully request that Norris's Motion for Preliminary Injunction be denied.

Date:   September 10, 2021                    FAEGRE DRINKER BIDDLE & REATH LLP

*/s/ Anne K. Ricchiuto*
Anne K. Ricchiuto (#25760-49)
Stephanie L. Gutwein (#31234-49)
300 North Meridian Street, Suite 2500
Indianapolis, IN 46204
Telephone:  317-237-0300
Fax:  317-237-1000
anne.ricchiuto@faegredrinker.com
stephanie.gutwein@faegredrinker.com

Uriel Abt
Michigan State University
Office of the General Counsel
426 Auditorium Rd., Rm 494
East Lansing, MI 48824-2600
Telephone: 517-353-3530
Fax: 517-432-3950
abturiel@msu.edu

*Attorneys for Defendants*

## CERTIFICATE OF COMPLIANCE

As required by LCivR 7.2(b)(ii), I certify that this document complies with the word limit contained within LCivR 7.2(b)(i) because, excluding the parts of the document exempted by that rule, this document contains 8,883 words, according to the word count function of Microsoft Word for Office 365.

Date:   Sept. 10, 2021

/s/ Anne K. Ricchiuto
Anne K. Ricchiuto

**CERTIFICATE OF SERVICE**

I hereby certify that on September 10, 2021, a copy of the foregoing was filed electronically. Service of this filing will be made on all ECF-registered counsel of record by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Harriet Hageman
Jenin Younes
John Vecchione
New Civil Liberties Alliance
1225 19th Street NW, Suite 450
Washington, DC 20036


/s/ Anne K. Ricchiuto