**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN**

| | | |
|---|---|---|
| **JEANNA NORRIS, on behalf of herself and all others similarly situated,** | ) ) ) | |
| *Plaintiffs,* | ) ) | |
| v. | ) ) | CIVIL ACTION NO.21-cv-00756-PLM |
| **SAMUEL STANLEY, JR., in his official capacity as President of Michigan State University; DIANNE BYRUM, in her official capacity as Chair of the Board of Trustees, DAN KELLY, in his official capacity as Vice Chair of the Board of Trustees; and RENEE JEFFERSON, PAT O'KEEFE, BRIANNA T. SCOTT, KELLY TEBAY, and REMA VASSAR  in their official capacities as Members of the Board of Trustees, of Michigan State University, and John and Jane Does 1-10,** | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| *Defendants.* | ) | |

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION
FOR A PRELIMINARY INJUNCTION
<u>(HEARING SCHEDULED 9/22/21)</u>**

**TABLE OF CONTENTS**

ARGUMENT ................................................................................................................ 1

I.   Plaintiff Has Established a Substantial Likelihood of Success on the Merits ................... 1

   A.   PLAINTIFF HAS A FUNDAMENTAL, CONSTITUTIONAL RIGHT TO BODILY AUTONOMY AND
   TO DECLINE MEDICAL TREATMENT .......................................................................... 1

      1.   *Strict Scrutiny Is the Correct Standard of Review* ...................................... 1

         a.  *Jacobson* Is Inapplicable Here. ................................................ 1

         b.  MSU Does Not Wield Michigan's Public-Health Police Powers............................ 2

         c.  Apart from *Jacobson's* Inapplicability and the Absence of a Police Power
         Delegation, Only Appropriately Tailored Measures Serving a Compelling Government
         Interest Can Meet Constitutional Muster Here. .......................................... 7

      2.   *Contrary to Defendants' Contentions, the Most Up-to-Date Science Establishes
      that Natural Immunity Is as Robust and Durable as That Acquired Through the Most
      Effective Vaccines, So MSU Has No Compelling Interest in Requiring Plaintiff to Receive
      a Vaccine Against Her Doctor's Advice* ...................................................... 11

   B.   DEFENDANTS' DIRECTIVE IMPOSES AN UNCONSTITUTIONAL CONDITION ON PLAINTIFF 14

   C.   DEFENDANTS' POLICY IS PREEMPTED BY THE FEDERAL EUA STATUTE........................ 17

II.   Plaintiff Will Suffer Irreparable Harm If the Court Does Not Grant Her Motion for a
Preliminary Injunction ........................................................................................ 20

III.   The Balance of Equities Weighs in Favor of Granting Plaintiff's Motion .................... 23

CONCLUSION ........................................................................................................... 25

i

## ARGUMENT

The Motion for Preliminary Injunction should be granted.  Exercising her constitutional and statutory rights of informed consent, Plaintiff Norris and those similarly situated (along with millions of other Americans) do not wish to take a COVID-19 vaccine because they have recovered from COVID-19 and have natural immunity to it.  Forcing Plaintiff to choose between her job and ability to support her family, and an unnecessary medical intervention, Defendants have issued an ill-conceived "Directive," mandating vaccination of all employees.  This is *not* a wrongful termination or damages suit.  This is a suit for prospective declaratory and injunctive relief so that Plaintiff can maintain her constitutional and statutory rights to bodily integrity and informed consent, invasion of which inherently constitutes irreparable harm.  Strict scrutiny must be applied to MSU's unlawful policy, which does not account for natural immunity.  Under this standard, the Directive must be invalidated so that those harmed by it can return, undisturbed, to their roles as productive MSU employees.  Indeed, the Directive is so flawed, crafted from blind reliance on federal guidance documents that are not law, that its refusal to take account of the scientific fact and immunological consequences of natural immunity cannot withstand any form of scrutiny.

I.  **PLAINTIFF HAS ESTABLISHED A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS**

A.  **Plaintiff Has a Fundamental, Constitutional Right to Bodily Autonomy and to Decline Medical Treatment**

1.  *Strict Scrutiny Is the Correct Standard of Review*

a.  ***Jacobson* Is Inapplicable Here.**  Plaintiff has already explained at length why *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), Plaintiff has already explained at length why *Jacobson v. Massachusetts*, 197 U.S. 11 (1905) does not apply to her case, namely that it involved legislative action, no ability to demonstrate natural immunity, and a one-time fine (*See* Plaintiff's Brief in

Support of Motion for a Preliminary Injunction ("Plaintiff's Br.") at 16-19; Complaint

("Compl.")). Ignoring these crucial distinctions, Defendants assert that "rational basis scrutiny

applies to vaccination requirements." (Defendant's Response in Opposition to Plaintiff's Motion

for a Preliminary Injunction ("Def. Opp.")  at 11).  But *Jacobson* predates the creation of tiers of

scrutiny.   Additionally, *Jacobson* did not address the ensuing 115 years of Supreme Court

precedent recognizing and expanding constitutional rights to bodily integrity.   While this Court

determined at the TRO stage that rational basis scrutiny applied here, with all respect to the Court,

its TRO decision was wrong on that point.  As explicated below, strict scrutiny is the standard by

which Plaintiff's constitutional claims, which trace to post-*Jacobson* developments in the law,

must be analyzed.

> **b.   MSU Does Not Wield Michigan's Public-Health Police Powers.**   *Jacobson* is

irrelevant for another, even more fundamental reason.   *Jacobson* deferred to an exercise of the

police power by the Massachusetts Legislature.   *Jacobson*, 197 U.S. 11.  But MSU is not the

Michigan Legislature and it operates under no delegation of Michigan's police power in the area

of public health.   Thus, *even if Jacobson* could be read so broadly as to stand for the proposition

that all *legislatively mandated* vaccine mandates are subject to rational basis scrutiny (which it

does not), that proposition still does not save MSU's Directive since it was not the product of

legislative action.  MSU does not have independent police power, and no Michigan statutes endow

MSU—through its governing Board of Trustees—with such authority.   *See* MCLA 390.101

through .123, ch. 390 (entitled "Universities and Colleges").  The Michigan Supreme Court takes

a very cautious approach to delegations of the state police power.  *See, e.g., In re Certified

Questions from U.S. Dist. Ct., W. Dist. of Mich., S. Div.*, 958 N.W.2d 1, 20 (2020) (holding that

emergency powers of governor act violated the State's separation of powers which limits the ability of the Executive to wield the legislative police power).

While Michigan law permits delegation of the state's police power, any such grant of authority must be clearly stated and delineated. As relevant here, it is clear that the University has been given powers to oversee education and finances (*see, e.g.*, Mich. Comp. Laws Ann. § 390.108 (educational matters), 390.118 & 390.120 (finances)), but MSU has no delegated power to regulate employee or student public health.[1]   As clearly stated in *G.F. Redmond & Co. v. Michigan Sec. Comm'n*, 192 N.W. 688, 689 (1923):

> The power to carry out a legislative policy enacted into law under the police power may be delegated to an administrative board under quite general language, so long as the exact policy is clearly made apparent, and the administrative board may carry out in its action the policy declared and delegated, *but it cannot assume it has been vested with power beyond expressed legislative delegation*, and must ever seek its way in the light shed by the legislative mandate.

In sum, MSU has no authority to implement the vaccine mandate here.[2]

---

[1] Additionally, compare the general but limited powers of the MSU Board of Trustees to MCLA 390.105, 390.111, and 390.112 (sometimes calling MSU the "Michigan agricultural college," MCLA 390.101, which is another name for MSU). Those limited powers refer to MSU's oversight of a university farm and the swamp lands in certain Michigan counties. MCLA 390.105, 390.111, and 390.112. But the police power over those types of lands is expressly delegated to the Michigan State Board of Agriculture, *not to MSU*. This reveals that the Michigan Legislature knows how to make broader police power delegations concerning MSU operations when it so chooses. *See also* MCLA 333.9205a(3)-(4) (permitting all Michigan institutions of higher education to *make information available* to students regarding "meningococcal disease and other diseases about which the department [of Health and Human Services may recommend immunization or immunization information") (emphasis added); MCLA 333.2611(3)(i) (same Michigan department can establish a non-profit corporation that *can coordinate research* with any public university in the state on public health policies and programs) (emphasis added). Accordingly, the absence of a statutory delegation of mandate-like, public-health powers to MSU or other state universities means those powers are reserved to the Michigan Legislature and its Department of Health and Human Services. Providing information and conducting research are far lesser powers than the power to mandate vaccination.

[2] And having failed to cite any Michigan legislative delegations to support the Directive, MSU has thus waived the argument that it is exerting delegated public-health police power in all events. *See*

3

Not only does MSU lack the police power entrusted to the State Legislature, its Directive has been crafted based on a flawed understanding of the enforceability of federal agency guidance against a state institution.  To begin with, the federal government does not possess police power. *See, e.g., United States v. Morrison*, 529 U.S. 598, 618 (2000) (referring to "the police power, which the Founders denied the National Government and reposed in the States").  The Centers for Disease Control ("CDC") and Department of Education guidance documents that MSU cites are not final agency action, are unreviewable by the federal courts, and for those reasons, do not carry the force of law, and thus cannot form the foundation—let alone the justification—for Defendants' policy.  *See Christensen v. Harris County*, 529 U.S. 576, 587 (2000) ("[W]e confront an interpretation contained in an opinion letter, not one arrived at after, for example, a formal adjudication or notice-and-comment rulemaking.  Interpretations such as those in opinion letters— like interpretations contained in policy statements, agency manuals, and enforcement guidelines, ... lack the force of law ....").[3]  The CDC and Department of Education guidance documents that MSU purports to rely on, *see* Def. Opp. Br. at 6-8, were simply not issued in accord with APA notice-and-comment procedures.

Just yesterday, Dr. Marty Makary, a surgeon and professor at Johns Hopkins University, published a piece documenting the CDC's ineptitude throughout the pandemic.  *See* Marty

---

*Vaughn v. Lawrenceburg Power Sys.*, 269 F.3d 703, 714 (6th Cir. 2001); *United States v. Skaggs*, 327 F.R.D. 165, 176 (S.D. Ohio 2018) ("due to the absence of privilege arguments in the government's opposition brief, the Court assumes that any privilege has been waived").

[3] *See also National Min. Ass'n v. McCarthy*, 758 F.3d 243 (D.C. Cir. 2014) ("[W]e may review agency action under the APA [Administrative Procedure Act] only if it is final" and "final guidance" from EPA did not equate to final agency action under 5 U.S.C. § 704); *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1020 (D.C. Cir. 2000) ("Only 'legislative rules' have the force and effect of law . . . . A 'legislative rule' is one the agency has duly promulgated in compliance with the procedures laid down in the statute or in the [APA].").

Makary, *Covid Confusion at the CDC,* THE WALL STREET JOURNAL (Sept. 14, 2021), *available at* https://www.wsj.com/articles/covid-19-coronavirus-breakthrough-vaccine-natural-immunity-cdc-fauci-biden-failure-11631548306 (last visited Sept, 14, 2021). "Sound data from the CDC has been especially lacking on natural immunity from prior Covid infection," Makary observes. He describes the Israeli study that Dr. Zervos, Defendants' expert, claims is unpersuasive because it is awaiting peer review (*see* Declaration of Marcus Zervos, M.D., attached to Def. Opp. as Ex. A ("Zervos Decl.") at ¶ 64) as "the most powerful and scientifically rigorous study on the subject to date." Makary further explains that "[i]n a sample of more than 700,000 people, natural immunity was *27 times more effective than vaccinated immunity in preventing symptomatic infections*." *Id.* (Emphasis added). Yet:

> U.S. public health officials continue to dismiss natural immunity, insisting that those who have recovered from Covid must still get the vaccine. Policy makers and public health leaders, and the media voices that parrot them, *are inexplicably sticking to their original hypothesis that natural immunity is fleeting, even as at least 15 studies show it lasts*.

*Id.* (emphasis added).

Makary also elucidates the way in which CDC's data from Kentucky has been twisted to support vaccination of the naturally immune (Zervos does the same (Zervos Decl. ¶ 40)). "[D]espite having data on all 50 states, the CDC only reported data from Kentucky" and Makary asks whether perhaps "Kentucky was the only state that produced the desired result?" *Id.* In any event, the rate of infection in each group ("vaccinated *and* naturally immune" and "only naturally immune") was 0.01%, meaning that infections were exceedingly rare in both groups during the short, two-month time period in which the cherry-picked study was conducted.

Aside from CDC's observable track record of disregarding the scientific evidence with respect to naturally acquired immunity to COVID-19, federal guidance can neither form the basis

for state action nor substitute for lack of a legislative delegation under Michigan law. Thus, MSU has circumvented the state legislative process, turning a non-binding (and wrongheaded) federal agency suggestion into an enforceable mandate that school employees must give up their constitutional rights to bodily autonomy—or their jobs—even after devoting years or decades of their lives to serving MSU. The University cannot demand that this Court accord to it the same deferential standard that applies to a legislative act, while evading the democratic safeguards that the public scrutiny, floor debate, and passage of such an act entail.[4]

One of the reasons that some legislative action (though not that which invades rights of bodily integrity) is afforded only rational basis review is that such decisions are made by elected officials accountable to the public. *See FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313-14 (1993) ("Where there are plausible reasons for *Congress's action*, our inquiry is at an end") (cleaned up and emphasis added). But MSU's Directive was developed in precisely the opposite manner. Indeed, to this day, Plaintiff does not know who created the Directive and upon what information those unknown drafters proceeded. While Defendants tout the credentials of Drs. Stanley (MSU's President) and Zervos, they do not assert that these two came up with the Directive, either alone or along with others. (*See* Def. Opp. at 9, 16).[5] And, Dr. Stanley's opinion

---

[4] As we explain below, strict scrutiny applies without regard to whether the Michigan Legislature or MSU as an administrator adopts MSU's Directive. But at the very least, in order to wrap themselves in *Jacobson*, MSU would either have to *be* the Legislature or point to a clear delegation from the Michigan Legislature. It cannot do either.

[5] Defendants principally rely on two cases to support their contentions: *Klaassen* and *Harris* (*see* Def. Opp. at 13-15). But the application of rational basis review in *Klaassen v. Trustees of Ind. Univ.*, No. 1:21-cv-238, 2021 WL 3073926 (N.D. Ind. July 18, 2021), is not binding in this court. Furthermore, the court did not address (and reject) an argument that rational basis review would only attach if the university vaccine mandate there was the product of the Indiana Legislature. Finally, that case may have involved different delegations of authority from those presented here. *See also* Pl. Br. in *Klaassen* at 46-52 (Dkt. # 7, *Klaassen*, 2021 WL 3073926). Furthermore, the central argument in that case was not about natural immunity, and the plaintiffs were students, not

about the basis for the Directive is irrelevant under the governing Michigan statute because as MSU's President, he is only an *ex officio* member of the Board "without the right to vote." MCLA 390.102.

The cases that Defendants cite to support the proposition that the rational basis standard applies to vaccine mandates likewise do not support their contention. (*See* Def. Opp. at 11-15). *Nikolao v. Lyon*, 875 F.3d 310 (6th Cir. 2017), involved a challenge to a Michigan State Law requiring vaccination of schoolchildren. And even *TJM 64, Inc. v. Harris*, 475 F. Supp. 3d 828, 834 (W.D. Tenn. 2020), applied rational basis review to an order issued by a *county public health department*. *TJM 64* contains no indication that the Western District of Tennessee considered whether the county public health department was operating under delegated police power. It is far more likely that such a delegation existed in that Tennessee case than it would here as to MSU because *TJM 64* involved the enactment of a public health department. MSU is not the equivalent of a public health department by any stretch.

 **c. Apart from *Jacobson's* Inapplicability and the Absence of a Police Power Delegation, Only Appropriately Tailored Measures Serving a Compelling Government Interest Can Meet Constitutional Muster Here.** The functional equivalent of strict scrutiny applies to Plaintiff's constitutional claims:

> Although the Supreme Court has declined formally to label its review in this context as "strict scrutiny," *see Riggins v. Nevada*, 504 U.S. 127, 136 (1992), the cases still ask whether the government has adequately demonstrated a *compelling need* for the intrusion, *a lack of reasonable alternatives*, *as well as procedural and medical safeguards*, *see id.* at 135–36. *See also Washington v. Harper*, 494 U.S. 210, 229 (1990) ("The forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty" requiring an important and legitimate state interest); *Cruzan v. Dir., Mo. Dep't of Health*, 497

---

employees. These same points also apply to *Harris v. University of Mass.*, 2021 WL 3848012 (D. Massachusetts 2021).

> U.S. 261, 269, 281 (1990) ("This notion of bodily integrity has been embodied in the requirement that *informed consent* is generally required for medical treatment," but state also has interest in life and informed consent).[6]

*Planned Parenthood Sw. Ohio Region v. DeWine*, 696 F.3d 490, 506 (6th Cir. 2012) (emphasis added). Vaccine mandates are a fundamental intrusion into bodily integrity, as receiving an injection obviously entails such an incursion. Indeed, for more than a century the Supreme Court has recognized that invasion of one's body can constitute "an indignity, an assault, and a trespass" prohibited at common law. *Union Pac. Ry. Co. v. Botsford*, 141 U.S. 250, 252 (1891). *See Washington v. Glucksberg*, 521 U.S. 702 (1997) ("[T]he Fourteenth Amendment 'forbids the government to infringe … fundamental liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest.'"). *See also Vacco v. Quill*, 521 U.S. 793, 807 (1997) (reaffirming holding of *Cruzan v. Dir., Mo. Dep't of Public Health*, 497 U.S. 261, 278 (1990), stating that "our assumption of a right to refuse treatment was grounded … on well-established, traditional rights to bodily integrity and freedom from unwanted touching.").

True, as Defendants observe, the Court in *Washington v. Harper*, 494 U.S. 210, 211 (1990), ultimately permitted the forcible injection of an antipsychotic medicine into a prison inmate because it agreed the government was pursuing a compelling interest in that case. And in *Glucksberg*, the Court held that because physician-assisted suicide was *not* deeply rooted in our country's traditions, the plaintiff had no fundamental right to it. Here, however, MSU cannot demonstrate a compelling government interest in forcing vaccines on employees with naturally

---

[6] *Compare, e.g., Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993) (government policy can survive strict scrutiny only if it advances compelling interests that the policy is narrowly tailored to achieve).

acquired immunity because they pose no risk to others.  Nor can MSU demonstrate that its Directive is narrowly tailored (or cannot be improved by the use of "reasonable alternatives" and "appropriate medical safeguards," *DeWine*, 696 F.3d at 506), given that it permits many of its employees to work off campus in the COVID-19 era.  *See, e.g.,* MSU Office of the President, Message,        https://president.msu.edu/communications/messages-statements/2020_community_letters/2020_03_23_coronavirus_update.html (last visited Sept. 14, 2021).

> Defendants argue that Plaintiff:
>
> [U]rges that strict scrutiny is warranted, without citing any authority suggesting that she has a *fundamental right to defy an employer's vaccination requirement*. Instead, she relies upon cases recognizing rights to bodily autonomy and to refuse medical treatment *under certain circumstances*.

(Def. Opp. at 12) (emphasis added).  Defendants thus appear to acknowledge that while one has a fundamental right to decline a specific doctor's recommendation (the "certain circumstances"), a statute mandating a particular medical treatment for an entire population or group of people can circumvent any right to refuse said treatment.  Setting aside the fact that no such statute exists in this case, since we dealing with a mere administrative policy unauthorized by a proper police power delegation, Defendants' view of the world would permit the government to *institutionalize entire classes of medical treatment* by law, forcing it on individuals and overriding ordinary individualized doctor-patient consultations.  But this policymaking at the grand scale makes the intrusion on basic rights to bodily autonomy *more constitutionally dubious*, not less.

In any event, assuming *arguendo* that only rational basis level of analysis should be applied, MSU's Directive cannot surmount even that bar.  As discussed extensively in Plaintiff's opening brief in support of a preliminary injunction and its supporting expert declarations, there is no reason to treat an individual with demonstrable, naturally acquired immunity any different from

a vaccinated person.  (*See* Plaintiff's Br. at 12-20).  Immunity is immunity is immunity.  Indeed, this is why vaccine efficacy is measured *with reference to natural immunity* in scientific testing.  (*See* Compl. at ¶¶ 32-50).  Hence, MSU's Directive, which explicitly disregards naturally acquired immunity, is simply irrational and unscientific.

Even if naturally acquired immunity provides a lower level of protection than the Pfizer and Moderna vaccines (a point which Plaintiff does not concede, since all evidence points to the contrary), there is no rational basis for treating Ms. Norris differently from someone who has received the Sinovac, Sinopharm, or Janssen vaccines, which are not FDA approved and confer only minimal levels of immune protection.  Accordingly, Plaintiff has shown that the "means chosen to effectuate a legitimate purpose are not rationally related to that purpose."  *Love v. Beshear*, 989 F. Supp. 2d 536, 547-48 (W.D. Ky. 2014) ("Rational basis review, while deferential, is not toothless.").

Defendants argue that they have a compelling interest in the mandatory vaccination policy, in part due to "practical considerations," asserting that Plaintiff "invites MSU to put itself in the untenable position of," *inter alia*, "tracking the date of every COVID infection among its staff; requiring periodic antibody testing of those individuals; monitoring those results for declining antibodies; and determining when immunization is necessary[.]" (*See* Def. Opp. at 19-20).  In fact, a more coherent policy would subject *all* employees to these antibody tests, since immunity following vaccination *also appears to wane*.  At the very least, it cannot be argued in good faith that any well-established body of evidence establishes that immunity achieved through WHO-approved vaccines is long-lasting while assuming—based on no science whatsoever—that natural immunity evaporates rapidly.  Indeed, the scientific community is increasingly realizing that boosters will be required, as the currently available vaccines have failed to provide durable

10

protection against COVID-19 infection. (*See* Reply Declaration of Dr. Hooman Noorchashm ("Noorchashm Reply"), Attachment A, at ¶¶ 7, 52-53, 55).

Furthermore, vaccination is unequivocally a *medical procedure*. As Dr. Noorchashm explains, medical treatments should never be prescribed on a one-size-fits-all basis. (*See* Declaration of Dr. Hooman Noorchashm at ¶ 11, 32 (attached to Plaintiff's Br. as Ex. B) ("Noorchashm Decl.")). If Defendants find themselves in an untenable position as a result of their decision to require that *all* employees and students undergo the same medical procedure, they should not at the same time be able to complain that they may need to allow employee- or student-specific accommodations where those individuals can show that they already have natural immunity levels equivalent to or higher than vaccine-based immunity. Plaintiff will not object to a system that puts the burden of proof on members of the MSU community to demonstrate individually that they possess the antibodies. Our position is that MSU cannot get away with pretending that naturally acquired immunity is irrelevant, as that is tantamount to arguing the extreme and unfounded position that vaccine-based immunity protects others, while naturally acquired immunity does not. That is not the science. (*See* Joint Declaration of Drs. Martin Kulldorff and Jayanta Bhattacharya at ¶¶ 15-24 (attached to Plaintiff's Br. as Ex. A) ("Joint Decl."); Noorchashm Reply at ¶¶ 1-7, 21-46).

2.  *Contrary to Defendants' Contentions, the Most Up-to-Date Science Establishes that Natural Immunity Is as Robust and Durable as That Acquired Through the Most Effective Vaccines, So MSU Has No Compelling Interest in Requiring Plaintiff to Receive a Vaccine Against Her Doctor's Advice*

Defendants devote a substantial portion of their Opposition to claiming that "[v]accinating individuals against COVID-19 is currently the leading prevention strategy to protect individuals from the virus and end the pandemic" (Def. Opp. Br. at 3-9) and that "stemming the spread of

COVID-19 is unquestionably a compelling interest." (Def. Opp. at 14).[7] While that may be so, Defendants have not shown and cannot show that Plaintiff presents a greater risk to herself or the community than a vaccinated individual.[8,9]

Through Dr. Zervos, Defendants claim that vaccination can boost or improve naturally acquired immunity.  (Def. Opp. at 6-7).  However, simply possessing higher antibody levels does not necessarily translate into clinical benefit, which is why the epidemiological data demonstrates that those with naturally acquired immunity only rarely become re-infected (*see* Noorchashm Reply ¶¶ 9-30).  The idea that more antibodies equates to greater immunological protection both simple-minded and wrong.  (Noorchashm Reply ¶ 4; Joint Decl. ¶¶ 17-18).

Nevertheless, even assuming *arguendo* that enhancing antibodies does provide additional protection, that still does not justify mandating vaccination of naturally immune people.  Indeed, everyone's antibody levels could, in this way, be heightened by receiving a vaccine every week, but we recognize that at some point a mandate of that type is not warranted, because any benefit

---

[7] Defendants cite *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) to support this claim.  That case did not address a vaccine mandate but rather limitations on church capacity. Plaintiff is not contending that quelling the spread of COVID-19 is not a compelling interest in the abstract, but rather that there is no compelling interest in forcing the vaccines on those with naturally acquired immunity and likewise no such interest in insisting upon a "one size fits all" approach to the public health challenges COVID-19 poses.

[8] Defendants misleadingly quote Plaintiff's assertion that MSU's policy lacks a valid public health basis, claiming that is "bizarre."  But Plaintiff did not claim that mitigating spread of COVID-19 is not a legitimate public health aim, only that *requiring those with naturally acquired immunity to receive a vaccine* is not a valid public health measure.

[9] Without making a specific argument, Defendants cite to President Biden's federal vaccine mandate, imposed by an Executive Order just a few days ago, on September 9, 2021.  It ought to be noted that many legal scholars have questioned the legality of this mandate, and approximately 26 States and counting have indicated that they intend to immediately challenge the OSHA part of the President's mandate when that is reduced to final agency action.

to third parties is too marginal to justify forcing such vaccinations.  The same logic applies to vaccination of those with naturally acquired immunity.  (*see* Noorchashm Reply ¶ 2, 4, 6-7).

Defendants do not even engage with Plaintiff's point that their acceptance of vaccines such as the Sinovac, Sinopharm, and Janssen vaccines is illogical, if preventing the spread of COVID-19 is indeed the Directive's true goal.  If concern about transmission is the guiding principle, then why do Defendants consider these vaccines—two of which are only about 50% effective at preventing infection—sufficient to fulfill its mandate, while treating naturally acquired immunity as non-existent? Plaintiff and those similarly situated are entitled to probe into what lies behind the Directive.  What emerges might show that MSU is more concerned about continuing its influx of foreign-student tuition dollars, which is assisted by accepting these inferior vaccines approved for use abroad, than by a pure public-health rationale.

Dr. Zervos's and Defendants' specious claim that the duration of naturally acquired immunity is unknown, justifying the university's mandate, also fails. (*See* Def. Opp. at 6-7; Zervos Decl. ¶¶ 42-51]).  As Drs. Bhattacharya and Kulldorff explain, we *also* do not know how long immunity from the vaccines lasts. (Joint Decl. ¶ 15).  Considerable evidence—including the study from Israel cited in Plaintiff's opening brief—indicates that vaccine-acquired immunity wanes after a number of months. (Joint Decl. ¶¶ 19-20). A study from Qatar likewise found no statistical difference in the risk of reinfection between those who had been vaccinated versus those who had been previously infected. (Joint Decl. fn. 15).  Indeed, every purported unknown with respect to naturally acquired immunity that Dr. Zervos alleges in his declaration is equally true as to the vaccines.

Finally, as Dr. Zervos undoubtedly knows, immunity is multi-faceted and antibodies constitute only one aspect.  Even when antibody levels wane, studies demonstrate prolonged

13

immunity from memory T and B cells, bone barrow plasma cells, spike-specific neutralizing antibodies, and IgG+ memory B cells.  (Joint Decl. ¶ 17; Noorchashm Reply ¶ 4).  That is why all epidemiological observational studies indicate that natural immunity is durable and long-lasting— there is no evidence whatsoever that cellular immunity wanes over time.  *See* Interview of Dorry Segev, M.D., "COVID-19 Vaccines and Immunocompromised People," *Johns Hopkins Bloomberg School of Public Health* (July 14, 2021), *available at* bit.ly/3lgAfeC (last visited Sept. 12, 2021) ("antibodies are the tip of the immunologic iceberg, and a lot is going on under the surface that we cannot measure.").  (Joint Decl. ¶¶ 18-24; Noorchashm Reply ¶¶ 21-42).

To summarize, all of the real-world, observational data establishes that, if curbing the spread of coronavirus is indeed the goal, naturally acquired immunity serves that end as well or better than vaccination.  Accordingly, Defendants cannot show a compelling interest in subjecting Plaintiff and those similarly situated (i.e., those with naturally acquired immunity) to their Directive.

**B.  DEFENDANTS' DIRECTIVE IMPOSES AN UNCONSTITUTIONAL CONDITION ON PLAINTIFF**

Defendants assert that, in order to establish that the Directive constitutes an unconstitutional condition, Plaintiff must identify an enumerated constitutional right that she is being coerced to relinquish.  But that is a misreading of the prevailing case law.  In *Memorial Hosp. v. Maricopa County*, 415 U.S. 250 (1974), the Court concluded that the county impermissibly burdened the plaintiffs' rights to travel by extending healthcare benefits only to indigent, ill individuals who had been residents for at least one year.  As the right to travel is *not* an enumerated right in the strictest sense (unless it is sufficient that it is encompassed by the liberty interests protected by the Fourteenth Amendment, which is equally true of rights to bodily autonomy), it is obvious that the court in *Koontz v. St. Johns River Water Management District*,

570 U.S. 595, 604 (2013), meant an *established* constitutional right when it referred to the existence of an "enumerated" right.  As discussed, Plaintiff's rights to bodily autonomy and to decline medical treatment are well-established rights protected by heightened scrutiny.

Defendants also argue that Plaintiff does not have a fundamental right to public employment, so the Directive does not create an unconstitutional condition. (*See* Def. Opp. 21-22).  That argument, too, misses the mark.  Unconstitutional conditions doctrine prohibits a state actor from premising the grant of certain benefits (or the withholding of certain detriments) upon an individual's surrendering her constitutional rights.  The benefits/detriments in question do not have to stem from fundamental constitutional rights or, indeed, from any form of constitutional rights.  The focus is on the financial (or other conditional) pressure put on the holders of constitutional rights.  In *Speiser v. Randall*, 357 U.S. 513 (1958), for instance, the benefit was a state property tax exemption. Obviously, there is neither a fundamental nor constitutionally recognized right of any person to receive a property tax exemption.  Likewise, in *Perry v. Sinderman*, 408 U.S. 593, 597 (1972), the Court expressly stated that

> this Court has made clear that even though a person has no "right" to a valuable government benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely.  It may not deny a benefit to a person that infringes his constitutionally protected interests[.]

The Court went on to observe that it had "applied the principle of denials to public employment," *id.* at 597, which is precisely the issue here.

Moreover, in *Maricopa County*, 415 U.S. at 259, the Court held that medical care is a "basic necessity of life" and therefore appropriately considered the subject of an unconstitutional condition.  If medical care is a "basic necessity of life," so is the job that pays the bills of not only Plaintiff, but her husband and stepchildren.  And that leverage is being wrongfully applied to

15

convince her to surrender her constitutional right to exercise informed consent and to decline a COVID vaccine.  The fact that *Speiser* involved leveraging against a First Amendment right is of no consequence.  Government regulators are endlessly creative, and they should not be able to evade their obligation to observe constitutional strictures by asserting that a mandate is non-mandatory simply because it proceeds by way of applying financial leverage—here, in the extreme—rather than via outright edict.

Citing *Nasierowski Bros. Inv. Co. v. City of Sterling Heights*, 949 F.2d 890. 896 (6th Cir. 1992), Defendants also argue that MSU's policy is "generally applicable," affecting "all MSU students, faculty, and staff 'equally.'" Accordingly, they contend, Plaintiff possesses no procedural due process right to be heard.  (*See* Def. Opp. at 22-23).  But this argument is predicated upon a misunderstanding of Plaintiff's position.  She contends that *because* she possesses naturally acquired immunity to COVID-19, MSU's policy *does not* affect her equally, as in her case the vaccine is medically unnecessary and poses a risk of harm to her (*see* Reply Decl. Noorchashm ¶¶ 8-12, 16-20, 49).  Furthermore, MSU's Directive is *not* generally applicable; it has carved out exemptions based on certain medical conditions and religious beliefs from its mandate.  *See Fulton v. City of Phila., Pa.*, 141 S. Ct. 1868 (2021) ("A law is not generally applicable if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exceptions") (internal citations and quotation marks omitted).  *Fulton* rejected arguments that government action should be viewed with lenity (put otherwise, that it should possess heightened powers) when (1) regulating its internal operations, *id.* at 1878, and (2) entering into employment contracts. *Id.*  That MSU can (in this case properly within its delegated police power to manage MSU's finances) decide on its employees' salaries and type of work they perform

is constitutionally irrelevant.  MSU is not the equivalent of a private employer and does not enjoy the rights such an employer may possess to impose a COVID vaccine mandate.

Finally, without citing any authority, Defendants argue that Plaintiff is not entitled to be heard at this stage in the proceedings, since she "has not, and cannot, allege that she would be disciplined without being offered further process." (Def. Opp. at 24).  But Defendants' Directive specifically states that those who do not comply with their vaccine mandate will face disciplinary action, including termination.  That is immediate and direct, not speculative.  Plaintiff—the family's primary breadwinner—should not have to wait until she is actually fired to seek relief. *Compare Abbott Labs. v. Gardner*, 387 U.S. 136 (1967) (holding that drug companies could bring a pre-enforcement review challenge where "the regulation [wa]s directed at them in particular; it require[d] them to make significant changes in their everyday business practices; [and] if they fail to observe the … rule they are clearly exposed to the imposition of strong sanctions").  The same is true, by analogy, to the famed *Abbott Labs* ripeness case here.  The Directive applies to Norris (as well as other MSU employees) in particular; they must make a significant change in their medical choices (by taking an unwanted and for-them medically unnecessary vaccine); and if they do not comply with the Directive, Norris and those similarly situated are exposed to severe economic sanctions.

## C.  DEFENDANTS' POLICY IS PREEMPTED BY THE FEDERAL EUA STATUTE

In addition to her constitutional claims, Plaintiff also possesses a statutory right to informed consent—a right protected by preemption doctrine.  *See* Complaint at Count III.  Such a preemption claim provides *stronger* rights to Plaintiff than the baseline level applicable to constitutional strictures because no balancing of competing government interests (whether tested by strict or rational basis scrutiny) can defeat such rights.  Plaintiff and those similarly situated

possess an absolute, statutory right to refuse an EUA-approved vaccine. This makes sense because such vaccines are subjected only to an abbreviated form of review, and basic medical ethics dictate that individuals should not be forced to take such medical products.

Defendants claim that the informed consent provision of the EUA statute, 21 U.S.C. § 360bbb-3, means only that the health care worker administering the vaccine must obtain consent in a literal sense and convey the risks and benefits associated with the vaccine before inoculating the patient. (*See* Def. Opp. at 24-25). This arid reading of the statute makes a mockery of it. Some individuals may be able to easily withstand unemployment to avoid taking a vaccine but many Americans are not so fortunate. Ms. Norris and other prospective class members are simply not the sorts of workers able to take on a job like Defendants—*i.e.*, as an MSU Board Member working for no pay. *See* MCLA 390.103 ("The members of the board of trustees shall serve without compensation, but shall receive the actual and necessary expenses [they incur]."). Plaintiff class members will in most cases not be able to risk being thrown into unemployment for long periods, jeopardizing their family's health insurance and, worse yet, being pushed into poverty. In short, the Directive is unmistakably coercive and impliedly preempted by the EUA statute. *See Geier v. American Honda Motor Co.*, 529 U.S. 861, 872-73 (2000) (local tort law impliedly preempted by a federal automobile safety standard); *Yates v. Ortho-McNeil-Janssen Pharms., Inc.*, 808 F.2d 281, 297-98 (6th Cir. 2015) (New York law impliedly preempted by federal regulatory law because it was impossible to unilaterally alter drug dosage without violating FDA regulations).

Defendants next claim that because the Pfizer Comirnaty vaccine has been fully approved, Plaintiff's preemption claim is moot. (*See* Def. Opp. at 26). But, as Plaintiff argued, the Comirnaty is *not actually available*. (*See* Plaintiff's Br. at 27-28). In reality, if she is to receive a vaccine somewhere in Michigan (or any other part of the country, for that matter), it would undoubtedly

be one of the three that remain approved only for emergency use (the Pfizer BioNTech, Moderna, and Janssen vaccines).   Though Defendants claim that FDA's description of the vaccines as "legally distinct," "does not result in an actual legal distinction that saves [Plaintiff's] claim," they do not further unpack that argument.   Typically, one legally distinct category is treated one way while a different legal category is treated another.   Just so here.   EUA vaccines, by statute, extend to recipients the right to accept or reject.   By contrast, fully approved vaccines are not accompanied by statutory informed-consent protections.   Hence, whether or not the Pfizer BioNTech and Comirnaty vaccines are factually identical is irrelevant.   The *legal point* is that the former requires informed consent as a matter of the EUA statute and the latter does not.[10]   No provision of the EUA statute, nor any judicial decision, holds that when an EUA vaccine is of the same formulation as an unavailable but approved vaccine, informed-consent rights no longer exist.   Rather, the EUA statute requires EUA-approved vaccines to be withdrawn from the market once a fully approved alternative is available.   The negative effect this would have on EUA-approved BioNTech, Moderna and Janssen vaccines may explain the slow roll-out of Comirnaty, but it does not justify a bait-and-switch under which the Pfizer BioNTech vaccine is treated as though it is Comirnaty.

Finally, it is important to note that MSU distances itself from the Office of Legal Counsel's opinion, which disregards the implied preemption effect of the EUA statute.   (Def. Opp. Br. at 25 n.14).   Instead, MSU's principal defense to preemption is the overly facile and legally irrelevant

---

[10] Even if the Comirnaty vaccine *were* commercially available, Plaintiff would challenge MSU's Directive on EUA grounds for two reasons: (1) it would raise entirely new legal issues and ensuing infirmities if MSU were functionally requiring employees to take *a particular vaccine* manufactured by a *single company*; and (2) even if *statutory* informed-consent requirements were no longer applicable in the wake of the coupling of (a) full approval *and* (b) commercial availability, Plaintiffs would possess their same *constitutional* rights to exercise informed consent set out in the first two causes of action mounted in the Complaint.

point that the Comirnaty vaccine has received full FDA approval.  Plaintiff also notes that the

Comirnaty is not commercially available because if it were, then all of the three EUA vaccines

could no longer lawfully be sold—an outcome that the FDA and Pfizer may be trying to avoid

because that would significantly reduce the COVID-19 vaccine supply and *worsen* the public

health.  *See* 21 U.S.C. § 360bbb-3(c)(3) (EUA authorization "only if … there is no adequate,

approved, and available alternative to the product for diagnosing, preventing, or treating such

disease or condition … .").[11]

## II.   PLAINTIFF WILL SUFFER IRREPARABLE HARM IF THE COURT DOES NOT GRANT HER MOTION FOR A PRELIMINARY INJUNCTION

In its TRO decision, this Court appeared to consider Plaintiff's claimed irreparable harm

in the context of a wrongful-termination case. *See Norris v. Stanley*, 2021 WL 3891615 (W.D.

Michigan 2021) (order denying preliminary injunction). But, with all due respect, this is not such

a case.  Rather, it is a *constitutional case*.  As Plaintiff explained in her primary brief, being coerced

into surrendering constitutional rights constitutes an irreparable harm, as the governing case law

clearly establishes. (*See* Plaintiff's Br. at 32).  *See also Overstreet v. Lexington-Fayette Urban*

*County Gov't*, 305 F.3d 566, 578 (6th Cir. 2002) ("[A] plaintiff can demonstrate that a denial of a

preliminary injunction will cause irreparable harm if the claim is based upon a violation of the

plaintiff's constitutional rights."); *Hartman v. Acton*, __F. Supp. 3d ___, 2020 WL 1932896, *4

(S.D. Ohio Apr. 21, 2020) ("Furthermore, where irreparable harm is based upon a violation of a

---

[11]  *See also* FDA, *Emergency Use Authorization for Vaccines Explained*, *available at* https://www.fda.gov/vaccines-blood-biologics/vaccines/emergency-use-authorization-vaccines-explained (last visited Sept. 15, 2021) ("Under an EUA, FDA may allow the use of unapproved medical products, or unapproved uses of approved medical products in an emergency to diagnose, treat, or prevent serious or life-threatening diseases or conditions when certain statutory criteria have been met, including that there are no adequate, approved, *and available* alternatives.") (emphasis added).

plaintiff's constitutional rights, that violation, no matter how temporary, is sufficient to show irreparable harm.").

Even apart from that simple point that the existence of a constitutional claim, if colorable, will *ipso facto* result in irreparable harm, there are two ways of looking at the injury in this case:

One possibility is that Plaintiff will, in actuality, be terminated, and her family deprived of its main source of income and its chosen health insurance, while her stepdaughter (and eventually her other stepchildren as they reach college age) will forfeit the tuition break Ms. Norris's status as an MSU employee brings.  Even if this were a damages case (and it is not—Plaintiff class seeks only prospective declaratory and injunctive relief), it is highly unlikely that the class could recover both front and back pay *and* lost tuition reimbursement, to say nothing of the fact that while litigation is going forward, the children of MSU employees currently attending MSU may have to uproot their lives by transferring to less-expensive schools or suffering the harm and lost opportunities associated with putting their college careers on hold.

The other possibility is that Plaintiff will come under such duress to receive the vaccine as disciplinary proceedings progress that she will reluctantly agree to accept the vaccine, and as a result will endure irreparable injury to her body.  As Dr. Noorchashm attests, receiving the vaccine, especially where a recipient employee possesses naturally acquired immunity, could result in adverse consequences, including permanent ones (*see* Noorchashm Decl. ¶¶ 12, 19-27; Noorchashm Reply ¶¶ 17-20; Joint Decl. ¶¶ 25-28).  Not only is this the case because *all* medical interventions entail some risk, but various studies have shown heightened risk of adverse events in individuals who have recovered from COVID-19. Indeed, since Plaintiff initially filed her complaint and preliminary injunction motion, a new study was published concluding that "the preponderance of evidence suggests that a non-negligible subset of COVID-recovered Americans

are, in fact, susceptible to adverse events following vaccination in excess of that which is experienced by COVID-naïve persons." (Noorchashm Reply ¶¶ 18-19). Dr. Noorchashm, who has consulted with Plaintiff and reviewed her serological screening results (Noorchashm Decl. ¶ 7), concluded that vaccination presents a "non-negligible risk of potentially irreversible harm to Jeanna Norris" and that this risk is only medically ethical if she willingly accepts it, and if leaving her unvaccinated would create a risk beyond that presented by individuals who are vaccinated but do not have naturally acquired immunity (Noorchashm Decl. ¶ 20). Note too that Michigan law exempts children (traditionally and generally the class of people subject to vaccine mandates) from immunization requirements "for any period of time as to which a physical certifies that a specific immunization is or may be determinantal to the child's health or is not appropriate." MCLA § 333.9215 (2021).

Assuming for the sake of argument that the chance is small, the fact that she *could* suffer long-term, adverse consequences warrants granting a preliminary injunction here to temporarily freeze the *status quo* until this litigation can be fully resolved on the merits. Defendants cannot claim in good faith that there is *no chance* she will experience such an incident.

Under either of these scenarios, Plaintiff has established irreparable harm even if the nature of the legal rights she is trying to vindicate are put to one side. Indeed, her injures are comparable to those that this Court found constituted irreparable injury in a case brought by student athletes against Western Michigan University. *See* Order Granting TRO *in Dahl v. Board of Trustees of Western Michigan University*, No. 1:21-cv-757, slip op. at 1 (W. D. Mich. 2021) ("[P]layers will not be able to participate in intercollegiate sports. WMU also states that the players will not lose their scholarship for the academic year.") And, of course, it would be legal error to ignore the constitutional dimension of this case, since that alone is enough to warrant a finding of irreparable

harm, a point this Court recognized in the *Dahl* litigation as well. *See id.* at 5-6 ("Having found a likelihood of success on the merits of Plaintiff's Free Exercise Claim, the balance of the factors weighs in favor of emergency injunctive relief. Where parties seek injunctive relief and allege a constitutional violation, the outcomes often turn on the likelihood of success on the merits, usually making it unnecessary to dwell on the remaining three factors.") (cleaned up). Plaintiff's claim in this case is every bit as constitutional as the *Kahl* claim.

## III.   THE BALANCE OF EQUITIES WEIGHS IN FAVOR OF GRANTING PLAINTIFF'S MOTION

Defendants' hyperbolic statement that its "interest and obligation in keeping its students, faculty, and staff safe, alive, and healthy" outweighs the harm to one individual in receiving a vaccination, seeking an exemption, or finding alternate employment entirely misses the mark. Plaintiff presents no health risk to anyone whatsoever because she possesses naturally acquired immunity to COVID-19, or at least no risk greater than that posed by vaccinated employees. She also works remotely, and Defendants are wholly in charge of whether she is ordered back on campus (*see* Declaration of Douglas Landis, attached to Opp. Br. as Ex. B at ¶¶ 7-10). While this case works its way through the legal process, no harm will befall anyone if Plaintiff's motion for a preliminary injunction is granted. And there are larger questions at issue here: (a) Plaintiff will move in due course for class certification; and (b) as the retention of the Faegre firm by MSU indicates, this case is not only about Plaintiff, but implicates an issue of national significance: whether individuals who can demonstrate naturally acquired immunity through antibody tests should be exempt from vaccine mandates.

Plaintiff would have applied for a medical exemption, but MSU specifically states that it does not recognize naturally acquired immunity among the bases for such an exemption. This forced Plaintiff onto the path of litigation. Other universities and institutions are recognizing

23

naturally acquired immunity in crafting their policies.  And, both Drs. Gottlieb (formerly head of the FDA) and Fauci of the National Institutes of Health have recently conceded that naturally acquired immunity should be part of any vaccine-mandate policy.[12]  Just yesterday the CDC appears to have embarked on the beginning of a journey toward recognizing the scientific fact of naturally acquired immunity, as it tweeted that an individual who has had COVID-19 within the past three months need not get tested after exposure to the virus.  *See* CDC (@cdc.gov), Twitter (Sept. 14, 2021), *available at* https://twitter.com/CDCgov/status/1437793535688908806?s=20.

*  *  *

During times of crisis, our constitutional and civil rights should not take a backseat.  *See Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 68 (2020) (Gorsuch, J., concurring) ("Even if the Constitution has taken a holiday during this pandemic, it cannot become a sabbatical.").

Usually, when the range of commentators reflect calmly, such scholars, judges, historians, and even journalists look back agree that some measures, enacted with little forethought to fight the latest crisis, did not make sense and, in fact, caused great unintended harm.  In other words, they eventually have to concede that rationality gave way in part to fear and panic.  Plaintiff posits that this is just such a scenario.

Ms. Norris and many others like her have naturally acquired immunity: not speculative or ephemeral immunity, but demonstrable and lasting resistance, provable by objective scientific tests that were not available when *Jacobson* was handed down.  Thus, the pertinent scientific evidence

---

[12] *See* Anderson Cooper interview with Sanjay Gupta and Anthony Fauci, *CNN* (Sept. 10, 2021), *available at* https://dailycaller.com/2021/09/10/fauci-doesnt-answer-recovered-covid-required-take-vaccine/ (last visited Sept. 12, 2021).

demonstrates that she and others similarly situated present a heightened danger to no one.  In light of all of this, the preliminary injunction should be granted, for "even in a pandemic, the Constitution cannot be put away and forgotten."  *Roman Catholic Diocese of Brooklyn*, 141 S. Ct. at 68 (per curiam).

**CONCLUSION**

For the reasons set out above, the Court should enter a preliminary injunction against Defendants' Directive.

September 15, 2021

Respectfully submitted,

*/s/ Jenin Younes*
Jenin Younes
Litigation Counsel
Jenin.Younes@ncla.legal
*Admitted in this Court*
* Admitted only in New York.  DC practice limited to matters and proceedings before United States courts and agencies. Practicing under members of the District of Columbia Bar.

*/s/ Harriet Hageman*
/s/ Harriet Hageman,* MSB #87482
Senior Litigation Counsel
*Admitted in this Court*
Harriet.Hageman@ncla.legal
* Admitted only in Wyoming, Colorado, and Nebraska.  Practice limited to matters and proceedings before United States Courts and agencies.  Practicing under members of the District of Columbia Bar.

*/s/ John Vecchione*

John Vecchione
Senior Litigation Counsel
John.Vecchione@ncla.legal
*Admitted in this Court*

NEW CIVIL LIBERTIES ALLIANCE
1225 19th Street NW, Suite 450
Washington, DC 20036
Telephone: (202) 869-5210
Facsimile: (202) 869-5238


*Attorneys for Plaintiffs*

26

**CERTIFICATE OF COMPLIANCE**
**PURSUANT TO CIV. L. R. 7.2(a)&(b)**

I hereby certify that this Brief contains 8,056 words, as produced by and counted by the

Microsoft Word Office 365 software.


_____ /s/ Jenin Younes